DANIEL EDWARD COLLINS *vs.* SOUTH BOSTON RAILROAD COMPANY.

Suffolk.   March 12. — July 3, 1886.   W. ALLEN & HOLMES, JJ., absent.

The parents of a boy about four years old permitted him to walk in the streets of a city in the daytime under the care of his sister, who was nearly eleven years old. In an action against a street railway corporation for an injury sustained by the boy while so walking, there was evidence that the girl was accustomed to take her brother to walk, and that she was a girl of ordinary intelligence, and bright about doing errands. *Held*, that it could not be ruled, as matter of law, that the parents of the boy were negligent in permitting him to go upon the streets with his sister, or that she had not sufficient intelligence and discretion to be entrusted with his care.

In an action against a street railway corporation for injuries occasioned to the plaintiff, while on a street crossing, by being struck by a car of the defendant, there was evidence that the driver of the car, as it approached the crossing, was looking back at a car which had passed. *Held*, that there was evidence of negligence on the part of the driver.

In an action against a street railway corporation for an injury occasioned, in the daytime, to a boy about four years old, the plaintiff's evidence tended to show that he was in the care of his sister, who was about eleven years old and of ordinary intelligence; that after starting to cross a street on the cross walk, the sister, who had hold of her brother's left hand, saw a car approaching, and kept on until they were near the track on which the car was approaching, and nearly abreast of the horses; that then she, becoming frightened, pulled away from her brother, or he from her, and left him, going either in front of the horses or in the rear of the car, and he, after being left, ran in front of the horses, and was knocked down either by the feet of the horse which was the farther from him when he started to run, or by the side of the dasher of the car, and was drawn under the car and injured. The rate of speed of the car, its distance when the sister first saw it, and the persons and objects in the street which might have influenced her conduct, were differently described by different witnesses. *Held,* that it could not be ruled, as matter of law, that the sister was not exercising the care over her brother which might reasonably be expected of a child of her age.

TORT for personal injuries. Trial in the Superior Court, before *Gardner*, J., who reported the case for the determination of this court, in substance as follows:

The plaintiff, a boy four years and twenty-three days old, lived with his parents in Athens Street, South Boston, near the corner of C Street, Athens Street being the next street northerly of and parallel to Broadway. He left home on the afternoon of July 29, 1882, in company with his sister Nellie, a girl eleven years of age less a month and five days, to buy candy at a shop on C Street, but on the other side of Broadway from where the plaintiff lived; and while on their way home, and crossing Broadway, the plaintiff was knocked or fell down, and was run over, in Broadway, by one of the defendant's cars, driven and controlled by its agents, coming from City Point and on its way to Boston, causing the injuries complained of.

Broadway runs about east and west, and C Street about north and south. On the southwesterly corner of Broadway and C Street is a cigar shop; on the northwesterly corner is a drug store, kept by one Gleason; on the southeasterly corner is a grocery; and on the northeasterly corner is a shoe shop, kept by one O'Hara. A cross walk, six feet wide, substantially in the line of the sidewalk on that side of C Street, runs across Broadway from the corner on which is the cigar shop to the corner on which is the drug store. The other corners are also connected, respectively, with cross walks.

The defendant is a corporation operating lines of street railway from Boston proper to City Point in South Boston, one of which runs through Broadway, a public street, where there are two tracks. The cars going from Boston run upon the southerly track, which is called the outward track; those coming to Boston run upon the northerly track, which is called the inward track; so that cars meeting pass each other to the right. At and approaching the point of intersection of Broadway and C Street, both streets are substantially level and straight for a long distance. Another line of the defendant's cars running to City Point, known as the Dover Street line, runs through Fourth Street (the next street south of and parallel to Broadway) to said C Street, thence northerly through C Street to Broadway, turning into the outward track in Broadway, and thence to City Point.

The report, after stating that the foregoing facts were not in dispute, and that the evidence in regard to the circumstances attending the accident was conflicting, set forth the testimony of the witnesses in full.

The following is a synopsis of the evidence in behalf of the plaintiff, so far as it is material to the points decided.

Patrick Collins testified that the plaintiff was his son; that, on the evening of the accident, he started out with his sister Nellie to get some candy; that Nellie assisted his wife in the care of the children; that his wife took in sewing, and Nellie, for the most part, brought the sewing and carried it back.

Ellen Collins, the wife of Patrick, testified that she had no one but Nellie to help about the house and children; that Nellie took the children to walk, and had taken them beyond the corner of Broadway and C Street; and that Nellie was kind and attentive to the children.

James McDermott testified that he was by Gleason's drug store, when he heard a shout; that he looked and saw the plaintiff, about five feet from the horses' heads, on the left-hand rail; that the next thing he noticed was the boy's being thrown down; that he should say it was the off forward foot of the off horse that threw him down; that he then looked at the driver, and found that he was leaning in a listless attitude, putting on the brakes; that he should think at the time that the driver was either

looking down the street or sidewise; that he supposed the boy went under the forward wheel and under as far as the hind wheel, and was dragged a considerable distance, say about twenty feet; that he should say the boy was on the cross walk; that the driver was leaning so that his right leg was toward the dashboard, and his back toward the witness; that the driver, after the boy was knocked down, put on the brakes; that the horses were within the rails; that, when the brakes were applied, the car was going about three miles and a half an hour; that, when he started for the car, he saw a young girl about opposite the middle of the car.

On cross-examination, this witness testified as follows: " The first shout came from the sidewalk, and the next shout, I think, from the driver. The first shout attracted me; saw the boy before I heard the second shout. Just as I heard the shout I threw up my eyes towards the horse car, and then saw the little boy. He was upon the nigh rail, that is, the farthest rail of the nearest track to me. I saw him run across in front of the nigh horse, and get struck by the off horse. I did n't see anybody with the boy at that time. I did n't see anybody run across in front of the boy, and I did n't see anybody run across the track behind him. The driver's back was toward me; I did n't see his face. I saw the boy ahead of him on the farther rail from me, running right across."

Frank McCue testified as follows: " When the accident occurred, I was on the south sidewalk of Broadway, about five feet from the corner of C Street, near the cigar store, intending to cross Broadway to Gleason's corner. I saw a little boy and girl. When I first saw them, they were crossing in front of me, and passed right along over upon the crossing, and the girl had hold of the boy's hand. They were going across Broadway from the cigar store toward Gleason's drug store. When I first saw them, they were just stepping off the curbstone to get on to the crossing. I looked after them for a little while to see where they went to. The little boy had hold of the girl's hand, and he went as far as the horse car, and the little girl let go of the boy's hand. I saw the horse car coming down there, and it was going at the usual rate, that is, at a trot. I could not tell how fast they were going, how many miles an hour. This little boy

happened to run right around, and he was struck. I could n't tell whether it was the car or the horses struck him; I am not sure. The horse car, when I first saw the children, was almost up to the second crossing, the one in front of O'Hara's, coming from City Point. The two children continued to walk, till I suppose the little girl got frightened. She was afraid the pole might strike her, or something, and she let go of her brother, and ran off. The pole was almost right up side of her, when she let go of her brother. They were on the crossing when she let go. They had kept right straight on the crossing from the time they had stepped from the curbstone until she let go of the boy. I did not hear any shout. The horses were between the tracks, in the regular place for them, going at a slow trot. The girl had hold of the boy's left hand. The boy was next to the horses. I saw him fall, and saw him under the wheels, and helped lift the car off. At the time I saw him fall, the horses were still trotting. The boy was in under the car, and I don't know, — I suppose some one hollaed to the driver, I could not tell who it was, that there was a child in under the car. When the child was in under the wheels, I took no notice of the driver; I saw him put on the brake. When the driver first began to put on the brake, the child was seven to eight feet from the crossing in under the wheels. When the little girl let go of the child, I could not tell what she did, or where she went. I noticed her coming along with her brother, and I noticed the two in separating from one another; the girl ran around upon the crossing; I never saw where she went to. The pole was almost up to her, almost side of her. When she let go of the child, I could not tell whether she was between the rails on which the car was coming, or in front of the horses. She was going across on the crossing when she let go. I should think the pole was not more than two feet from her. I saw how the driver was standing with respect to the horse car as the car came down Broadway just prior to the accident. The best way I could explain it is that he was standing kind of sideways. The driver was standing in the usual place with his right side against the car dasher, and his face turned to the left, looking down C Street, towards Fourth Street. He was standing kind of sideways. I don't know when he changed his attitude; I don't

believe he changed it until he found out there was a young one under the wheels. He applied his brake as soon as he found out that there was a child in under the wheels."

On cross-examination, he testified: "The little boy did not pull away from the sister; it was the sister pulled away from the boy. At the time the girl pulled away from the little boy, they were on the crossing, on the outward track that leads down to City Point, between the outward rails, and the car was coming on the inward track. When the little girl pulled away from the little boy, she ran away and left him. The little boy tried to get out of the way as well as he could. The pole of the car was pretty near up side of the boy when the girl pulled away. He ran right around after his sister pulled away from him; right around in front of the horses. I don't know whether the horses or the car hit him, but he was hit, or he went under the axle of the car, on the farthest side from me. He ran right around the horses' heads. He curved out around, did n't run straight. The car was coming so close upon him, he tried to go in front of the horses, and in doing that he had to curve around to his left."

On re-direct examination, the witness testified: "The child remained on the cross walk until the car came up to him, and then ran around the pole to try to escape from it. In running around the pole, I should think he left the cross walk; he must have left the cross walk, because the pole was almost upon the cross walk.

William J. Lowry testified as follows: "I am a police officer of the city of Boston. I remember the accident to the Collins boy at C Street. It occurred about twenty-five minutes past seven o'clock; it was daylight, the sun had not set. I was on the southerly side of Broadway on the sidewalk, perhaps one hundred and twenty or one hundred and thirty feet from the cigar store in the direction of Boston, walking toward Boston. My attention was attracted by some person hollaing quite loud, apparently from across the street and back of me, on Gleason's side of Broadway. I turned around and looked in that direction. I saw an open car come to a stop suddenly, and I saw people rushing toward the off side from me. The car was in the act of stopping; the driver seemed to be putting on his brake hard. I did

not see the child that got run over at that time when I looked around, nor the Collins girl. There was quite a rush all over the street towards the car, so I could not specify any particular person. I did n't see any little girl in the vicinity of the horses. I measured the distance from the point of the car pole to the crossing; it was forty-seven feet; found the car and pole to be by measurement thirty-five feet long, and made calculation that the rear end of the car was about twelve feet over the crossing. I measured to the side of the crossing nearest to the car. When I first saw the child, it was directly between the wheels, or the axles of the car, underneath, in the middle of the track; I should think about twenty-four feet from the crossing. The car was apparently coming to a standstill when I looked around. I could not judge how much farther it went; being in a direct line with it, I could not judge exactly, but it apparently was stopping. I noticed the driver braking up his car hard at the time I looked around. I think the child was run over before I looked around."

William P. Carroll testified as follows: "I remember when the accident happened to the Collins boy. I was on the northerly or right-hand side of Broadway, coming to the city, — the same side that Gleason's apothecary store is on; about seventy-five feet towards Boston from Gleason's store, going towards C Street. I think it was children in the street playing after the band car that attracted my attention. I know that I looked up, and when I looked up, I saw a girl and a boy crossing from the tobacco store to the apothecary store. I saw a car coming; I saw there was going to be an accident; I did n't see any way that the accident was going to be avoided. I saw the driver, holding his reins, and looking as if he was looking back the way he had come; he might have been looking down a street, but it looked to me then, taking it all in an instant, that he was looking to his left, up Broadway. I immediately jumped and yelled and ran. The accident, the running over of the boy, the turning on of the brake, and all, was in an instant, as I saw it, — all in a second. When I saw this boy and girl in danger of being run over, it seemed certain they were on the cross walk. When I first saw them, that horse car may have got across the crossing at O'Hara's, and it may not; all this I saw so quick, and every-

thing at once, that I don't want to say the car was on the O'Hara crossing. I think myself the car might have got across the crossing, and was between the two crossings. What I saw was an accident going to occur, and that position of the car, and the position of the children, forced that conclusion on me ; there had to be an accident, and I saw no way to avoid it. After I shouted, I heard nothing; only to get to the car. The horses of the car were in the usual place in the centre of the track ; they were between the two rails, going in an ordinary trot. I saw the little child when he fell down, and saw him struck by the horses, and the girl just getting away from him. I thought the two children would get under the car; that is the way it looked to me. The little boy was struck by the horse ; the other child just escaped. The child falling, the putting on of the brake, and all, was as quick as it could be. The child might have fallen a little bit before, but I don't want to swear to it. As I have testified before, I believe it all occurred right in an instant, and it is impossible for me to decide which occurred first. When I looked up, I am positive the driver was as I have described, and after the time of the accident I talked to him about it. His position was as I have described it, looking up to what had passed by, — a band car. There was certainly a band car in that vicinity ; it came up C Street, and went up Broadway toward City Point. There were a number of children in the street; boys and girls together."

On cross-examination, the witness testified : " I saw the boy get struck by the horse nearest me, — the right-hand horse as the driver was driving. The little girl had just escaped it. She was toward Gleason's. She ran across right in front of him, as it appeared to me. She had just got off the rail running towards Gleason's as the little boy was struck. Both were together when I first saw them. At the time the off horse struck this boy, they were just together, and the boy got struck and the girl just escaped it. I saw them separate. I saw them, as I thought, having hold of hands then ; I did n't see them when they took hold of hands. I believe the girl was on the left-hand side of the boy. I saw them with their hands together, and when the boy was struck, I saw the separation right there at the instant the boy was struck. I cannot really state positively which was

nearest the horses. I think they separated just as the boy was struck, a little prior; probably it might be a little before the boy was struck. When they separated, they were four feet, or whatever the distance might be, a small distance from the horses' heads."

Nellie Collins testified as to the buying of the candy, and then starting for home; and that when she started to cross Broadway toward Gleason's she had hold of her brother's hand. Her testimony proceeded as follows : " When I first stepped down on the cross walk, I turned around and saw the band car. I continued walking along on the cross walk. I saw the band car before I saw the one coming from City Point. I saw the latter when it got to O'Hara's crossing. The horses were on O'Hara's crossing. This was after I had looked back at the band. We were near the rail the cars come up on from Boston when I saw the horses at O'Hara's crossing, and walked along. I had hold of Eddie's hand. Next noticed the horses between the two cross walks. As we walked over the cross walk, Eddie was next to the horses."

She further testified that she heard some one holla, and left Eddie and ran across, because she thought she was going to be knocked down herself. " The horses' heads, when I let go of him, were pretty close to us ; we were then between the four rails. I do not know who it was I heard shout, or the direction it came from. I let go of Eddie just as soon as I heard it. I was not playing with Eddie, or fooling, or playing with the other children, running around, or doing anything of that kind. I was on the cross walk when I let go of Eddie. I cannot tell whether Eddie was knocked down by the horses or the car."

On cross-examination, she testified : " Eddie pulled away from me across in front of the horses, before I ran. We were stopping between the outward and the inward tracks. I thought I could get across before the car came. I heard some one holla, and that scared me. I let go of Eddie and left him there."

In answer to a question whether she ran around in front of the horses, the witness answered, " Yes." Later on, in her cross-examination, she said she did not know whether she ran in front of the horses or in the rear of the car.

Mrs. Rhodam B. Eckett testified as follows: " I started to cross Broadway on the crossing from Gleason's to the cigar store, and at the same time I saw two children enter the cross walk from the opposite side of Broadway at the cigar store, — a boy and a girl; and I turned around to see if the road was clear; I had already stepped off the sidewalk, I believe; and I stepped back to look up Broadway towards the Point. As I stood looking, my attention was arrested by a shout; the car was coming then; I noticed the car, but I had full time to cross, only that I thought I saw my husband there. The shout attracted my attention, and as I turned, I saw these two children still on the cross walk and the car quite close to them; and the little boy seemed to drag back, and the little girl started ahead, and the little boy made a short hesitation, and then started too. I stood and held my breath. I certainly thought the child would clear the horses, as he did. He cleared the horses, and I could not say if it was the hind foot of the horse or the end of the car that struck the child. The child cleared the horses' heads. Then I saw no more. I first saw the car when I first turned up to look if the place was clear. It was a little distance above the upper cross walk, O'Hara's cross walk. The horses were not more than the length of the horses above O'Hara's crossing when I looked up. The horses, in my estimation, were trotting as fast as they always do on Broadway. The two children, when I first saw them, were entering on the cross walk, on the cigar-store side. I noticed the children before I noticed the horse car. The children when I first saw them were on the cross walk. When I next saw them they were on the cross walk, I should judge, almost between the two car tracks at the time I heard the shout. I think they were just about entering the track that the car was on, when the little girl let go of Eddie. As near as I can estimate, when the shout was, they were between the two tracks; and when she let go, they were on the cross walk about at the first rail the car was coming down on. The horses were inside the rails as usual. The driver did not commence to put on the brake till after I heard the shout; he commenced before Eddie was down. When the driver commenced to put on his brakes, I should judge the child was just passing in front of the horses. The girl ran forward and cleared the horses, and I thought the

little boy would too. She ran towards Gleason's corner. She did not run back to the other side of the car."

On cross-examination, this witness testified : " When I looked up, the car was up at O'Hara's, about the length of the horses, I should say, from the cross walk. Then I saw these little children coming across. I had plenty of time to cross. The car was coming at what, I suppose, you call a trot. My attention was for a moment diverted from the children, by looking for my husband ; then I heard a shout, and I looked up, and I saw the little boy seem to pull back from the little girl. When that happened, I should think he was just entering on to the last car track. They had crossed the first car track, I am sure, and I should judge they were just entering the second one, the one nearest me, the one the car was on ; the shout was what made me look up. I saw that scene in front of the horses, the little boy dragging back. I should judge they were about three feet from the horses' fore feet ; I don't know how far from their heads. The little boy seemed to hesitate for a minute ; the little girl had n't let go of him then ; the hesitation seemed only momentary ; when she let go and ran, he followed. Then they had n't hold of hands. The little girl did not run in a curve, and go around the horses' heads ; I could not say about the boy; she cleared the horses, and I think the boy too ; he may have swerved a little, but the little girl did not run off the cross walk. I am sure it was not the front feet hit him, nor the pole. He had got across the two horses. It was either the hind feet of the horse or the step at the side ; it was an open car. He had cleared the front feet of the horses when he was struck."

Jennie Mullaly testified that she had been a school teacher for seven years in the public schools of Boston ; that Nellie Collins came in September, 1882, and left in June, 1883 ; that she was a child of ordinary intelligence, and was promoted from her room with the other children in whose class she was ; that she was sent for absent girls quite often, and was very bright about errands, and very quick.

In view of the opinion of the court, it seems unnecessary to state the evidence in behalf of the defendant in detail. It tended to show that the children were not crossing the street on the cross-walk ; and the driver and the conductor of the car testified

that, after the plaintiff passed the horses, he went several feet towards the sidewalk, and then turned back and was struck by the forward end of the car.

At the close of the evidence, the defendant asked the judge to rule that, on all the evidence, the plaintiff was not entitled to recover, on the ground that he had not shown that he was in the exercise of due care, or that his custodian exercised such care, or that the defendant was negligent. The judge declined so to rule, and submitted the case to the jury, under instructions not excepted to. The jury returned a verdict for the plaintiff in the sum of $13,000.

If, upon the evidence, the case was properly submitted to the jury, the verdict was to stand; otherwise, to be set aside.

*R. D. Smith & P. West*, for the defendant.

*H. E. Bolles*, (*G. A. Sawyer* with him,) for the plaintiff.

FIELD, J. We cannot say, as matter of law, that the parents of the plaintiff were negligent in permitting him to go upon the streets with his sister, who was then nearly eleven years old, or that the sister had not sufficient intelligence and discretion to be entrusted with the care of him. *Mulligan* v. *Curtis*, 100 Mass. 512. *Lynch* v. *Smith*, 104 Mass. 52. *O' Connor* v. *Boston & Lowell Railroad*, 135 Mass. 352. Neither can we say that there was not evidence for the jury of negligence on the part of the driver of the car. There was evidence that he was looking back. *Commonwealth* v. *Metropolitan Railroad*, 107 Mass. 236. The driver of a horse car in a street where there are children may well be required to manage his car with reference to all the risks that may reasonably be expected, and among these may be reckoned the risks arising from the heedlessness and indiscretion of children in the street.

All the evidence in favor of the defendant may be disregarded in considering the questions of law before us, and the evidence of Nellie Collins is not necessarily to be taken as true against the plaintiff, if there is other evidence in his favor which contradicts it.

It must be taken, on any view of the case, that the plaintiff ran across the track in front of the horses, and was hit either by the off fore leg or off hind leg of the off horse, or by the right-hand side of the dasher of the car or of the body of the

car, and thus thrown down and under the car, or that he fell upon or near the right-hand rail and was drawn under the car. His sister left him just before they reached the track on which the car was coming, and when the horses were dangerously near to them; and either ran across in front of the horses, or ran back, leaving him to run across alone, while she afterwards followed him, going either in front of or behind the car. It was said in *Lynch* v. *Smith*: " It does not necessarily follow, because a parent negligently suffers a child of tender age to cross a street, that therefore the child cannot recover. If the child, without being able to exercise any judgment in regard to the matter, yet does no act which prudence would forbid, and omits no act that prudence would dictate, there has been no negligence which was directly contributory to the injury." 104 Mass. 57. But if the child does act in a manner which would be careless in a prudent person of mature years and ordinary intelligence, and this carelessness contributes to the injury, what is the test by which the conduct of the child is to be tried in determining whether it has exercised due care?

Courts have held that, up to a certain age, not very accurately defined, it must be conclusively presumed that a child has not sufficient intelligence and discretion to exercise due care under the circumstances and in the place in which he is found, and that it is negligence on the part of the persons who have charge of him to permit him to go there unattended. If such a child has not acted as reasonable care would dictate, judged by the ordinary standards for adult persons, and this has contributed to the injury, and if the persons having the charge of such a child have negligently permitted him to go there alone, both these facts constitute negligence which will prevent him from maintaining an action. There is also an age within which courts have held that one child is conclusively presumed not to have sufficient intelligence and discretion to take charge of another who is younger, and that it is negligence on the part of the parents or guardians of such children to permit them to go together to places of danger, and if they do, and the children do not use reasonable care, and this has contributed to the injury, they cannot recover. Beyond these ages, courts have left it to the jury to determine whether the parents or guardians were negligent in

permitting a child to go alone to a place of danger, or in permitting him to go there in charge of another child, and if it is found that they were not negligent, then it has been left to the jury to determine whether the child or children reasonably exercised that degree of care of which they were capable, and it has been said that it is only necessary for them "to exercise such capacity as they had." The care which an adult person is bound to exercise is said to be the care which a person of ordinary intelligence and prudence would exercise, and is not determined by the amount of intelligence which he actually possesses, unless he is *non compos mentis;* and as the law, as far as is practicable, endeavors to establish general rules of conduct, it is probable that the more accurate statement of the law for children is the one usually made, namely, that a child is to be held to the exercise of that degree of care which may reasonably be expected of children of his age, or which children of his age ordinarily exercise. This court, with more or less hesitation, in what it deems plain cases, according to common experience, has declared that the acts or conduct of an adult under the circumstances constituted, as matter of law, contributory negligence, and the question arises whether the court can make the same declaration concerning the acts or conduct of a child of tender age, who yet is so old that they cannot say, as matter of law, that he has not sufficient discretion to be permitted to act on his own judgment. We think it has been in effect decided that the same general principles govern courts in either case, although the degrees of care required are different. In *Mattey* v. *Whittier Machine Co.* 140 Mass. 337, the plaintiff was six years and seven months old at the time of the accident, and the opinion implies that there might be cases in which the court would hold, as matter of law, that a girl of that age was guilty of contributory negligence. See *O'Connor* v. *Boston & Lowell Railroad, ubi supra.*

In *Messenger* v. *Dennie*, 137 Mass. 197, and 141 Mass. 335, the plaintiff was eight years and nine months old, and the court held that there was no evidence of due care on his part, and that he could not recover, saying that "his injury was the natural consequence of his careless act." Take the case of boys in the street suddenly and intentionally running across in front of trotting horses for the purpose of showing who dares run the nearest,

or take the most risk. Suppose the driver's testimony in the case at bar is true, that the plaintiff, after having crossed safely, turned round and ran under the side of the car, would not that be contributory negligence, if the child were old enough to act alone? In instructing juries that the question for them to decide is whether the plaintiff or the plaintiff's custodian has exercised that degree of care which might reasonably be expected of a child of his age, or which is ordinarily shown by children of the same age, is it intended that they may make allowances for any spirit of recklessness or of mischief which they may think is commonly found in such children, or must they consider only their capacity of self-control, and their intelligence and ability to understand the danger, and the consequences which may reasonably be expected to follow from their conduct? It would seem that, if children unreasonably, intelligently, and intentionally run into danger, they should take the risks, and that children, as well as adults, should use the prudence and discretion which persons of their years ordinarily have, and that they cannot be permitted with impunity to indulge in conduct which they know, or ought to know, to be careless, because children are often reckless and mischievous.

If all this be true, however, and certainly it is as favorable a view of the · law for the defendant as our decisions admit of, and if we assume that the plaintiff was too young to go upon the street alone, and that his conduct was such that, if he had been alone, he could not recover, yet we cannot say, as matter of law, that there was no evidence for the jury that his sister, who had the charge of him, was not exercising the care over her brother which might reasonably be expected of a child of her age, although the weight of evidence is strongly against it. The jury must have found that she did not wilfully and deliberately expose her brother to the risk, but only that, when the danger became imminent, she did not act with that coolness, prudence, and self-control which might reasonably have been expected of an older person. Her conduct up to the time the danger became imminent, the rate of speed of the car, its distance when she first saw it, and the other persons and objects in the street which might have influenced her conduct, are differently described by different witnesses. There is the same difficulty in

this case which the court found in *Mattey* v. *Whittier Machine Co., ubi supra.*

All the facts which ought to be considered are not made sufficiently certain by the testimony to enable us to decide that there was any error of law in submitting the case to the jury. By the terms of the report, the                    *Verdict is to stand.*