ELINE A. EVENSEN, administratrix, *vs.* LEXINGTON AND BOSTON STREET RAILWAY COMPANY.

Worcester.   October 5, 1904. — November 23, 1904.

Present: KNOWLTON, C. J., BARKER, HAMMOND, LORING, & BRALEY, JJ.

*Negligence,* Contributory of third person, In driving, Gross negligence. *Words,* " Gross negligence."

An administrator can recover for the death of his intestate caused by the gross negligence of the servants of a street railway company, if the intestate at the time of the accident had intrusted himself to the care of the driver in a wagon by whose side he was sitting, and the driver was in the exercise of due care.

Whether one driving in a wagon at night, who, approaching a cross road on which electric cars run, listens and hears no gong or other sound indicating the approach of a car, his view of the cross road being at some points wholly obstructed by houses and as he comes near the track much obscured by overhanging trees, and drives upon the track where he is struck by a car, is in the exercise of due care, is a question of fact for the jury.

It is evidence of gross negligence on the part of a motorman within the meaning of R. L. c. 111, § 267, upon which a street railway company may be found to be liable for causing the death of a person who is in the exercise of due care and is not a passenger or in the employ of such corporation, that on a dark night an electric car was run down a slight grade across an intersecting street in a thickly settled part of a town, where the view from one street to the other was at some points entirely cut off by houses and at others greatly obscured by overhanging trees, at a speed of from ten to twelve miles an hour without sounding any gong, that a traveller in a wagon was run over at the crossing and his body was found about seventy feet from the place of collision, where it evidently had been thrown or carried by the car, and that the car stopped about thirty-five or forty feet farther on.

TORT by the administratrix of the estate of Martin Evensen, under R. L. c. 111, § 267, for the use of herself as widow and of seven minor children, for causing the death of the plaintiff's intestate through the alleged gross negligence of the defendant's servants, in running down the intestate while he was being driven in a farm wagon by one Helchier, whose guest he was, down Academy Lane and across the tracks of the defendant on Sudbury Road in Concord.   Writ dated April 25, 1902.

In the Superior Court *Gaskill,* J., at the close of the plaintiff's evidence, ruled, that the plaintiff had not shown due care on the part of her intestate, and had not shown gross negligence on the part of the defendant's servants and agents, and ordered a verdict for the defendant.   The plaintiff alleged exceptions.

*G. R. Warfield,* for the plaintiff.

*A. P. Rugg,* (*H. H. Thayer* with him,) for the defendant.

HAMMOND, J.   The team was owned and driven by Helchier, who was sitting upon the right hand side, while Evensen the plaintiff's intestate was sitting on the left hand side.   The evidence tended to show that the latter " was not feeling well, " and had the collar of his overcoat turned up, and that he had intrusted himself to the care of the driver.   The question therefore upon this branch of the case is whether Helchier was in the exercise of due care.   It would serve no useful purpose to recite the evidence in detail.   If the plaintiff's testimony is to be believed, Helchier, at several points on Academy Lane, as he was approaching Sudbury Road, looked for the car; he was listening all the time and he heard no gong or whistle or anything else indicating the approach of a car; while at some points

he could see two or three hundred feet up the track on Sudbury Road, his view was wholly obstructed at others; and as he came near the corner of the two streets and near the track the view was much obscured by overhanging trees, both upon the lane and upon the road.   Upon this, in connection with the other evidence, especially that with reference to the speed of the car and the darkness, we cannot say as matter of law that Helchier was not in the exercise of due care.   It was a question for the jury. *Kelly* v. *Wakefield & Stoneham Street Railway*, 179 Mass. 542.

It is strongly urged by the defendant that there was no evidence of gross negligence on the part of the servants of the defendant ; that there is nothing to show that the rate of speed was any greater than usual, and that the failure to sound the gong is not of itself gross negligence.   There is perhaps no term of which it is more difficult to give a practically useful definition, or even to form a practical conception, than this term " gross negligence " as used in the statute under which this action is brought, especially when the dividing line between that and what is called ordinary negligence is to be drawn.   In some respects it is perhaps unfortunate that a right of action may be made to depend upon this dividing line.   Of course the greater includes the less, and where there is gross negligence there is always negligence.   The line between due care and negligence may be stated clearly enough for the practical administration of the law, but when one leaves the shore of due care and plunges into the sea of negligence, how far out can he go before he crosses the dividing line between what is called ordinary negligence and gross negligence?   The most that can be said, perhaps, is that gross negligence is further from due care than ordinary negligence, but that is not entirely satisfactory.   Still the dividing line is left undisclosed, for how far out does ordinary negligence extend ?   We are sensible of the danger of drawing the line too near to due care, and of finding gross negligence where only ordinary negligence exists.   Each case, however, must be decided according to its peculiar features.

In this case it appeared that Academy Lane and Sudbury Road were both public highways in the thickly settled residential part of the town.   The evidence tended to show that a person travelling upon the lane could have only a very imperfect view up

Sudbury Road, the view being entirely cut off at some points by houses and greatly obscured at others by the overhanging trees located upon the south side of the lane and the west side of the road. The same obstructions of course would have a similar effect upon the view which a motorman on the road would have of a traveller on the lane. The night was dark, and there was evidence that no gong was sounded and that the car was going from ten to twelve miles an hour down the slight incline of the road; that Evensen's body was found on the track about seventy feet from the place of the collision, where it evidently had been thrown or carried by the car, and that the car stopped about thirty-five or forty feet farther on. In view of the situation of the two ways in a thickly settled part of the town, the amount of travel reasonably to be expected thereon, the objects which obstructed or impaired alike the view which the traveller upon the lane could get of the car and that which the motorman could get of the traveller, the darkness of the night, the speed of the car, the incline of the rails, their nearness to the west side of the road and to the trees on that side rendering it impossible for a team coming out of the lane to avoid a collision by turning to the west of the track, and especially the very serious consequences likely to arise in case of collision with a car moving so rapidly, we cannot say, as matter of law, that the motorman was not guilty of negligence, or that the negligence was not of so high a degree as to amount to gross negligence. The question was for the jury.

*Exceptions sustained.*