JOSEPH SULLIVAN, JR., *vs.* BOSTON ELEVATED RAILWAY COMPANY.

JOSEPH SULLIVAN *vs.* SAME.

Suffolk.    March 15, 16, 1906. — May 17, 1906.

Present: KNOWLTON, C. J., MORTON, LORING, BRALEY, & SHELDON, JJ.

*Negligence.*

There is an age of a child, beyond that at which as matter of law he is incapable of exercising care and before reaching that at which as matter of law he is capable of exercising care, when, in an action by the child for personal injuries, it is a question of fact for the jury whether under the circumstances attending his injury he was incapable of exercising care so that no care on his part personally need be proved.

In an action for personal injuries by a child run over by a car of a street railway company, if it appears that the plaintiff was a boy four years and three months of age, a lively child, active and energetic, that the car was running on a city street at the rate of from fifteen to twenty miles an hour, that the plaintiff was crossing the street with another boy who was slightly older ahead of him, and

that he walked at a "pretty lively gait" or trotted "at a fair little jog" into the forward fender of the car which ran over him, it is a question for the jury whether the plaintiff has shown that he was incapable of exercising care and so was not required to exercise it in crossing the street.

In an action by a child for personal injuries from being run over by a car of a street railway company, if it appears that the plaintiff was a boy four years and three months of age, a lively child, active and energetic, that the parents of the plaintiff with their three children occupied an apartment on the third floor of a house in which lived three families who used the hallway and front door in common, that it was a rainy day and the plaintiff's mother let him play in the hallway on the ground floor with another little boy who had come to play with him, that the mother was washing at a tub in a small kitchen opening into a small entry that led into the hallway on the third floor and that every few minutes she went about ten or twelve feet to the rail where she looked down to see the little boys, and she also could hear them at play while she was at the tub, that finally she missed them "because it was so quiet all of a sudden" and, after looking down and seeing they were not there, called to her husband to go down and see where the plaintiff was, that, while she was washing, her husband was in another room tending the baby who was sick, that the husband on going down learned that the plaintiff had gone with the other little boy out of the front door and had been run over by a car of the defendant, that the plaintiff's mother never allowed him to go out when it rained, that the father knew that the street outside was a dangerous place, that he heard the mother tell the boy to be sure and stay in the entry, and he told the boy not to go out of the entry on to the door steps, and did not think he would go out when he had told him not to, that "he was always a good boy to mind." *Held,* that the question whether the plaintiff's parents exercised due care was one of fact for the jury.

TWO ACTIONS OF TORT, the first by a boy, four years and three months old when injured, for personal injuries from being run over by a car of the defendant, and the second by the boy's father to recover for the loss of his services and for expenses resulting from the accident. Writs dated November 12, 1901.

In the Superior Court the cases were tried together before *Gaskill,* J.

One Moran, a witness for the plaintiffs, testified that he was looking out the window of a store on Dorchester Avenue, on September 18, 1901, the day of the accident; that he saw two boys, one of whom was the minor plaintiff, leave the sidewalk on the opposite side of the street and start directly across; that they were walking pretty lively; that the other boy was ahead; that they looked pretty close; that a north bound car was coming along at a high rate of speed, from sixteen to twenty miles an hour; that the fender of the car hit the child and knocked him over, and the rear truck ran over him and cut his leg off; that

the witness did not know whether the forward truck ran over the boy, but certainly saw the hind truck go over his leg; that there was no other car in sight going either way; and that this car kept on to the next crossing, from two hundred to two hundred and twenty-five feet away.

One Bradley, a witness for the plaintiffs, testified that he was on Dorchester Avenue, going toward Mount Vernon Street; that he saw two little boys come around the corner of Mount Vernon Street and come running down Dorchester Avenue on the sidewalk; that after they got a little down the avenue they stepped from the curb to cross the street; that the car had then just crossed Mount Vernon Street, from one hundred and twenty-five to one hundred and thirty feet away; that he noticed the car coming and turned around to see how they were getting along; that he saw the boys going at a fair little jog; that the plaintiff crossed the nearer track and then was struck by the fender on the nearer side of the front; that he spun around and fell and went under the car; that the car was going at an awful rate of speed, from fifteen or twenty miles an hour; and that it did not slacken its speed from his first view of it until the boy was hit and did not stop until it reached Harvest Street.

Mary A. Sullivan, the mother of the boy, testified " that she lived at 36 Mount Vernon Street, which is the second building from the corner of Dorchester Avenue. They lived in the third story. Three families occupy the building and all use the same entrance. She had three children at the time of the accident. The oldest was six, the plaintiff was four years and three months, and the third child was twenty-one months younger than the plaintiff [two and a half years of age]. On September 18 it was raining. The baby was not very well. Her husband was at home. She was washing when the accident happened — washing at the tub — and her back was toward the door. The plaintiff had been playing in the house with Charlie Dunn, who had come in to play with him. They played around a little while and got tired and she allowed them to go down to the front entry in the lower story, which was a large, square place, where they were accustomed to play. She could see them and she could hear them all the time they were playing there. She left the tub every few minutes and went and looked down. She

could look from the top of the stairs down in the front entry
and hear them and see them play. She could hear them while
she was at the tub. They were there fifteen or twenty minutes.
During that time they had both come up and got a piece of
bread and butter and then went down and played again, and
the witness had gone to the top of the stairs and looked down
and could see them and hear them playing. Finally she missed
them and she called to his father to go down and see where the
plaintiff was. It was not more than a couple of minutes,
she believed, when, because it was so quiet all of a sudden,
she missed them, not hearing them, and went and looked
and they were not there. The door of her kitchen was open
into the hallway. It was a very small kitchen which opened
into a small entry and that opened into the hallway. It was
perhaps ten or twelve feet from where she was washing to the
rail where she looked over. She told her husband to go and see
where the children were, but finally, not hearing him, wiped her
hands and started to go down, and as she did met two of the
neighbors coming to tell her about the accident. While she was
washing, her husband was in the front room with the baby.
She had given the children permission to stay in the entry and
play. At that time the hall door was closed. The plaintiff was
as large as any child of four years at that time."

On cross-examination she said " that the plaintiff was a lively
child, active and energetic; that Charlie Dunn lived on Mount
Vernon Street; that her husband hadn't anything to do that
afternoon; it was his time off. He was going to work after
supper. He was there in the house looking after the children
and had nothing else to do. There were four rooms in their
apartment. The front room overlooked the street and he was
in that room. If you looked out the window you could look up
and down the street but there was a stoop over the front door
that prevented your seeing the steps. Charlie Dunn came in
through the front hall door. It was 'uncatched.' It was not
fastened. Any little boy could open it. Of course, it was just
as easy for these little boys to get out as it was for Charlie
Dunn to come in. She let them go down to the lower floor,
knowing that the door was such that they could easily open it.
She never allowed the plaintiff to go out when it rained. The

door was such that they could easily get out if they escaped her observation for a moment. Charlie Dunn was an active boy, too. They were friends; they always played together when outdoors. Charlie Dunn lived on the other side of Mount Vernon Street. To get to his house they would have to go outside and cross the street. She had lived in that neighborhood eight years and three months. The baby was fussy. His teeth troubled him. He did not have to have the doctor or anything of that sort and the baby was up and dressed. Her husband could have stepped out or down the stairs. He was in the front room. It opened on the hallway. While she was busy with washing, her husband was in the front room with the door closed between him and the hallway. The front hall door where the boys were playing opened upon the street, so if they opened the door that Charlie Dunn opened when he came in they would be right out there, ready to go out on the street. It was not cold weather. The plaintiff was fully dressed, but not in the ordinary way for going out. He had on the same suit of clothes he wore every hot, sunshiny day to go out and play. He had a little jacket on because the entry was damp. If she was going to send him out on a wet day she would dress him in a coat. He had his cap on. He wore it most all the time in the house. At her washing tub she had a scrubbing board and was busy all that afternoon. It made very little noise; she could hear the children. She told her husband she would look after them. He was taking care of the other child and you can't neglect one to take care of others. They had lived in that neighborhood eight years and she knew there was a double line of electric car tracks on Dorchester Avenue. It was one of the main thoroughfares of the city and the cars passed there frequently. She did not send the plaintiff across because she thought it was dangerous. She thought it was dangerous because of the travel there and she knew well if he got out there he would be in danger. If he should disobey and go out the door she could not catch him without going down two flights of stairs. He never stayed out more than a couple of minutes at a time any time. She always lived on these stairs, going up and down on them, watching the children in the entry, to see they were safe, because any mother is always nervous; she always kept them under her eye."

Joseph Sullivan, the father of the plaintiff in the first case and the plaintiff in the second case, testified " that on the day of the accident he was not working; he was at home; he stayed in the house all day. In the afternoon he was holding the baby in the front room. The baby wasn't well and he was rocking him. His wife was washing. At some time, his wife came in and spoke to him about the plaintiff. About five minutes before that he had seen the boy come up and get a piece of bread and butter, then he heard him going downstairs and did not see him again. Later, his wife came in and said she had missed the plaintiff and that he had better go down and see where he was. He was then about the centre of the room in a rocking chair, rocking in his arms the baby Frank. He went down cellar and did not find him, so he went out on the sidewalk and saw a crowd and learned that the plaintiff had been run over."

On cross-examination this witness said " the baby was sick with cramps and pains in his stomach and they gave him castoria; he was not holding the baby all the afternoon. The baby would lie down on the couch there. If the witness wanted to go out he could have gone out. The plaintiff did not want to go out on account of the child ailing. He knew the minor plaintiff was downstairs, and that Charlie Dunn had come to play with him and he knew that the front door was very seldom fastened and supposed a little boy could open it without difficulty and that his little boy was down there playing in the hall right near the front door. He knew that Dorchester Avenue was a dangerous place. He heard the mother tell the boy to be sure and stay in the entry. He told the boy not to go out of the entry on to the door steps. You don't know what a little child will do, but he was always a good boy to mind. He did not think he would go out when the witness had told him not to. The door of the front room where the witness was was ajar when the boys went down with their bread and butter and he hollered out to his son not to go out of the entry."

There were other witnesses for the plaintiffs. There were also witnesses for the defendant.

At the close of the evidence the defendant asked the judge to make the following rulings :

1. Upon all the evidence the plaintiff cannot recover.

2. There is no sufficient evidence that the plaintiff was incapable of exercising due care.

3. There is no evidence that the plaintiff did exercise due care. On the contrary, his conduct shows lack of any care whatever.

4. There is no sufficient evidence of care on the part of the boy's parents.

The judge refused to make the first, second and fourth rulings requested, and submitted the cases to the jury. At the beginning of the charge the judge said:

"Well, in the first place you have got to consider the boy's age. That is one of the material things here. If that boy had been of an age, or was in fact of an age where he could appreciate the situation in which he was, was competent to exercise any degree of care for his own protection, then there is no evidence that he did exercise any care. So that, the first proposition being that the plaintiff must establish by a fair preponderance of the evidence that the boy was incompetent to exercise any care, you come to that as the first question."

The jury returned verdicts for the plaintiffs, in the first case in the sum of $12,000, and in the second case in the sum of $3,000. The defendant alleged exceptions.

*C. F. Choate, Jr.*, for the defendant.

*C. C. Johnson*, for the plaintiffs.

LORING, J. 1. The defendant's contention in support of its second request for a ruling is that in a case where the minor child who is injured (after getting on the street in question without negligence on the part of his parents) has not exercised any care, the burden is on the plaintiff to prove that he was incapable of exercising any care; and that in the case at bar these plaintiffs did not sustain the burden of proving that fact; that in the case at bar that fact was left to conjecture and was not proved.

There doubtless is an age where the court can say as matter of law that a child cannot exercise any care under any circumstances. There also is an age where the court can say as matter of law that a minor is capable of exercising some care under circumstances like those in question. See in this connection *Collins* v. *South Boston Railroad*, 142 Mass. 301, 314. The

limits of these two classes are not settled by our decisions. There are now and probably always will be cases where it fairly may be said (as it was said in the case at bar) that the child did not under the circumstances exercise any care, and yet it cannot be said as matter of law that an ordinarily prudent child of the age or having the capacity of the child in question (whichever is the correct statement) was capable or incapable of exercising care. Such cases must be left to the jury. In such cases the matter is not a matter of conjecture, and yet nothing more can be proved than was proved in the case at bar. In the case at bar it was proved that the plaintiff in question was "a lively child, active and energetic," four years and three months old. The circumstances calling for the exercise of care on his part were these: The accident happened on one of the main thoroughfares of Boston, on which the defendant had a double track, surface railway, (and if the plaintiff's evidence was to be believed) a car was running from fifteen to twenty miles an hour. This boy, while crossing this thoroughfare, walked at a "pretty lively" gait, or trotted "at a fair little jog" into the forward fender of the defendant's car. At the time he was behind another boy, who was slightly older. This made out a case for the jury. See in this connection *Wright* v. *Malden & Melrose Railroad,* 4 Allen, 283; *Munn* v. *Reed,* 4 Allen, 431; *Callahan* v. *Bean,* 9 Allen, 401; *Lynch* v. *Smith,* 104 Mass. 52; *Gibbons* v. *Williams,* 135 Mass. 333; *O'Connor* v. *Boston & Lowell Railroad,* 135 Mass. 352; *McGeary* v. *Eastern Railroad,* 135 Mass. 363; *Marsland* v. *Murray,* 148 Mass. 91; *Slattery* v. *O'Connell,* 153 Mass. 94; *Creed* v. *Kendall,* 156 Mass. 291; *Grant* v. *Fitchburg,* 160 Mass. 16; *Powers* v. *Quincy & Boston Street Railway,* 163 Mass. 5; *Hewitt* v. *Taunton Street Railway,* 167 Mass. 483; *McNeil* v. *Boston Ice Co.* 173 Mass. 570; *Butler* v. *New York, New Haven, & Hartford Railroad,* 177 Mass. 191; *Walsh* v. *Loorem,* 180 Mass. 18; *Cotter* v. *Lynn & Boston Railroad,* 180 Mass. 145.

2. We are also of opinion that the question of the parents' negligence was for the jury.

The difficulty with the argument of the defendant's counsel here is that he has not told us what more (in his opinion) the parents were as matter of law called upon to do. Since the day

was a rainy one, we cannot say as matter of law that it was not proper to keep the minor plaintiff in the house.   Under the circumstances the lower hall cannot be said to be an improper place for the boys to play in although the front door was not locked.   The front door was the common door of all three apartments and so not within the control of the boy's parents. Neither can we say that the mother ought to have left her washing to stand over the boys while playing, and the same is true as to the father, who was to go to work after supper and who was spending what was his night looking after the sick baby two and a half years of age.   It is to be noted that on the uncontradicted testimony the boy " was always a good boy to mind," and was cautioned by both father and mother not to leave the entry; and also that within two minutes after the noise of their play ceased the father started to look for the boys, on being asked to do so by the mother who had kept herself where she could hear, and where, by going ten or twelve feet to the rail, she could look down and see them while they played in the entry.  *McGeary* v. *Eastern Railroad,* 135 Mass. 363. *Marsland* v. *Murray,* 148 Mass. 91.  *Slattery* v. *O'Connell,* 153 Mass. 94.  *Creed* v. *Kendall,* 156 Mass. 291.  *Powers* v. *Quincy & Boston Street Railway,* 163 Mass. 5.  *Hewitt* v. *Taunton Street Railway,* 167 Mass. 483.  *McNeil* v. *Boston Ice Co.* 173 Mass. 570.  *Butler* v. *New York, New Haven, & Hartford Railroad,* 177 Mass. 191.  *Walsh* v. *Loorem,* 180 Mass. 18.  *Cotter* v. *Lynn & Boston Railroad,* 180 Mass. 145.  *O'Brien* v. *Hudner,* 182 Mass. 381.  *Mellen* v. *Old Colony Street Railway,* 184 Mass. 399.

*Exceptions overruled.*