ELIPHALET L. BEALE, administrator, *vs.* OLD COLONY
STREET RAILWAY COMPANY.

Norfolk.   March 7, 1907. — June 20, 1907.

Present: KNOWLTON, C. J., MORTON, HAMMOND, SHELDON, & RUGG, JJ.

*Negligence.   Street Railway.*

In an action by an administrator against a street railway company for causing
the death of the plaintiff's intestate, a boy about seven years of age of above
the average intelligence, there was evidence that the plaintiff's intestate was
killed by a car running on a single track railway, the nearer rail being about
two or three feet from the edge of the sidewalk from which the boy came,
that the portion of the street where the death occurred was a residential sec-
tion with dwelling houses on both sides, that the defendant's cars usually
moved slowly over this portion of the street and that the plaintiff's intestate
was familiar with the way in which they were operated there, that in approach-
ing the place where the plaintiff's intestate came upon the track it was next to
impossible to see a car approaching from the direction from which this car came
on account of the trees along that side of the street, an old board fence and a
hedge, that in the direction from which the car approached there was a stop
signal which the motorman disregarded and ran by, that the car was going at a
very high rate of speed, almost its full speed, that two women on the sidewalk
nodded and bowed to the motorman who nodded, bowed and smiled in return,
that the road then was clear ahead for at least two hundred and forty feet, and
the motorman put on his power at full speed and turned and bent over to the
left toward the sidewalk as far as his arms allowed him to reach, nodding and
gesticulating to the women, that this went on for nearly half a minute, that
when the motorman threw his power on there was a tip cart ahead crossing the
track, that suddenly some noise drew the motorman's attention back to the car,
and when he had returned to his proper position the tip cart was passing over
the rails some twelve or fifteen feet away, that the car was so close upon it
that the tip cart barely escaped being struck, that the plaintiff's intestate was
crossing the rails immediately behind the tip cart, that he was not big enough
to jump upon the cart and was struck by the car when near the farther rail
and when with another good step he would have cleared the track, that there
was no ringing of the gong nor any exclamation of warning from the motorman
to the boy, that the speed of the car had not slackened when it struck the boy
and the motorman could not get the car stopped for one hundred and eighty
feet after it struck him.   At the time of the accident the car was going not less
than fifteen miles an hour.   *Held,* that the questions of the due care of the
plaintiff's intestate and of the gross negligence of the motorman were for the
jury.

TORT by an administrator under R. L. c. 171, § 2, or R. L.
c. 111, § 267, for causing the death of the plaintiff's intestate as

stated in the opinion by the alleged gross negligence of the defendant's agents or servants.   Writ dated July 26, 1904.

In the Superior Court the case was tried before *Crosby, J.,* who ordered a verdict for the defendant.   The plaintiff alleged exceptions.   The following is a reduced copy of a plan used at the trial.

The case was submitted on briefs.

*J. W. McAnarney,* for the plaintiff.

*R. Foster, W. D. Turner & G. Hoague,* for the defendant.

RUGG, J.   This is an action of tort to recover for the death of the plaintiff's intestate, Earl R. Beale.   It is unnecessary to determine whether it is brought under R. L. c. 171, § 2, or under R. L. c. 111, § 267.   The plaintiff's intestate, on August 27, 1904, was a child seven years and six weeks old, above the average intelligence, and was struck and killed by a car of the defendant on Washington Street in Quincy.   The tracks of the defendant at the place of the death were on the westerly side of the street and the westerly rail thereof was distant from the nearest edge of the sidewalk about two or three feet.   There was a single track in this portion of the street and the car was proceeding from the direction of Weymouth, northerly toward Bos-

ton. Some distance south of where the accident occurred, Foster
Street joins Washington Street on its westerly side, and near the
place of the accident a street, called Maple Place, also enters
Washington Street on its westerly side. On the northwesterly
corner of Maple Place and Washington Street, there was a vacant
lot from which a house had been moved, and there was a house
on the adjacent lot northerly bounding on Washington Street.
The public library was nearly opposite the place of the accident.
There was evidence tending to show that at the time of the acci-
dent there was a high board fence and tall lilac bushes at the
junction of Foster and Washington Streets, and that extend-
ing northerly toward the place of the accident on land on the
westerly side of the street next to the track, there were other
bushes and shrubs ten feet high and leaning over the sidewalk.
These extended part way to the place of the accident and from
there on to the place of the accident there was a growth of maple
trees thirty feet apart, extending along the westerly side of
Washington Street close to the edge of the sidewalk; that the
cars of the defendant usually moved slowly over that portion of
Washington Street lying between Foster Street and the place of
the accident and at the corner of Foster and Washington Streets
there was a stop signal; that it would be next to impossible for
a person entering Washington Street from Maple Place to see a
car approaching from the south on account of the trees along
that side of the street, an old board fence and a hedge; that the
child was familiar with the manner in which the cars were oper-
ated along this portion of Washington Street, and that this por-
tion of the street was a residential section with dwelling houses
on both sides. There was testimony from a passenger riding on
the front seat of the car of the defendant, which caused the
death, that " a short distance south of the junction of Washing-
ton and Foster Streets there is a steep grade and the car . . .
when near the junction of Washington and Foster Streets . . .
was going at a very high rate of speed . . . almost its full speed.
. . . A little after the car passed Foster Street, which is two
hundred yards from where the boy was struck, and was going
toward Maple Place . . . it passed two women who were walk-
ing on the westerly side of Washington Street and the one who
was nearest the car, nodded and bowed to the motorman. He

nodded, bowed and smiled in return. She then held up a pear in her hand and waved it to him. He laughed, nodded and gesticulated again, then he looked in front of the car, saw that the road was clear, and the witness saw that the road was clear for at least two hundred forty feet, before the accident. The motorman put his power on at full speed and, turning around, continued the same maneuvering with the woman as before, so far as his arms would allow him to reach, turning his left side toward the sidewalk and passing his body in front of the witness so as to obscure the witness's view. When he threw his power on, there was a tip cart crossing the tracks. It came from the westerly side right across the street. While he was in that position, suddenly some noise on his right drew the motorman's attention back to the car and the moment he got to his proper position, the witness saw clearly in front of the car, some twelve or fifteen feet away, a tip cart crossing the street and passing directly over the rails, and a little boy stepping behind it. The car was so closely upon it that the tip cart barely escaped being struck by the car. The boy seemed to hesitate a moment and then suddenly went out of sight. The boy came out from the vacant lot on the westerly sidewalk. The boy was stepping behind the cart and he did not seem to realize. He was caught in a trap and was not big enough to jump upon the cart. When he was struck, he was near to the easterly rail . . . another good step and he would have cleared the track. He must have been within eight or ten inches from the rail, because the tip cart cleared it. There was no ringing of the gong or any exclamation of warning from the motorman to the boy. The speed of the car had not slackened any when it struck the boy. The motorman could not get the car stopped for one hundred and eighty feet after he struck the boy. . . . The motorman must have been nearly half a minute bending over looking at the woman while his body was in front. . . . The car was about thirty feet long." Another passenger testified that the motorman, after seeing the women, " smiled and partly checked up the speed of the car, then looked ahead and there was a clear track. . He threw his controller handle clear around and leaned over to the left in front of the witness. . . . He continued in that position quite a period, then some outcry . . . caused him suddenly to come back into

his place, and as he did so, witness got a clear view of the track and about fifteen or twenty feet ahead on the .right close by the rail, he saw the boy. The motorman immediately threw off his power and attempted to set his brake, which took up his whole attention. He struck no gong, made no outcry and seemed terribly affected. The speed of the car had not slackened when it struck the boy. When the car struck the boy, he was only about a foot from the outer (easterly) rail. The car proceeded fifty yards, possibly more, after striking the boy, before it came to a stop. . . . The speed at which the car was going was such that he got a little mite shaky over it. . . . Should judge that the car at the time of the accident was going not less than fifteen miles an hour. . . . After the motorman saw the boy . . . he did everything he could have done to stop the car."

The first point to be considered is whether, upon this evidence, the question of due care of the plaintiff's intestate should have been left to the jury. If, upon all the evidence, his conduct " was such as the judgment of common men would universally condemn as careless in any child of sufficient age and intelligence to be permitted to go alone " upon such a. street (*Hayes* v. *Norcross*, 162 Mass. 546), or if it is left to conjecture. or surmise that he exercised ordinary care, the plaintiff cannot recover (*Gleason* v. *Worcester Consolidated Street Railway*, 184 Mass. 290). The plaintiff is bound to prove that his intestate was, at the time of the injury, in the exercise of such care as might reasonably be expected of children of that age, or which ordinary children of his age, under similar conditions, would exercise. *Murphy* v. *Boston Elevated Railway*, 188 Mass. 8. *Sullivan* v. *Boston Elevated Railway*, 192 Mass. 37. *McDermott* v. *Boston Elevated Railway*, 184 Mass. 126. *Burns* v. *Worcester Consolidated Street Railway*, 193 Mass. 63. The difficulty is, not as to the controlling principles of law, which are familiar and have been frequently stated, but with their application to the facts appearing upon this record. Taking into account the overhanging bushes, fences, trees and other obstructions to the view of the approaching car (*Kelly* v. *Wakefield & Stoneham Street Railway*, 179 Mass. 542, *Evensen* v. *Lexington & Boston Street Railway*, 187 Mass. 77), that the cars at this point ordinarily ran slowly, while the car in question was proceeding at a

high rate of speed, without giving any signal of its approach
(*Williamson* v. *Old Colony Street Railway*, 191 Mass. 144, *Cop-ley* v. *New Haven & Northampton Co.* 136 Mass. 6), that there
was a stop signal at the corner of Foster Street not heeded by
the car, that the boy, in crossing the tracks of the defendant,
was proceeding closely behind a tip cart, by the skill of whose
driver he might properly be influenced (*Burns* v. *Worcester Con-solidated Street Railway*, 193 Mass. 63, *Howland* v. *Union Street
Railway*, 150 Mass. 86) and the assumption that other travellers
upon the street, including the street railway itself, would exer-cise a proper degree of care (*Hennessey* v. *Taylor*, 189 Mass.
583), it cannot be ruled as matter of law that the plaintiff's in-testate was negligent.    *O'Shaughnessy* v. *Suffolk Brewing Co.*
145 Mass. 569.    *Slattery* v. *Lawrence Ice Co.* 190 Mass. 79.    *Aiken*
v. *Holyoke Street Railway*, 180 Mass. 8.    His conduct in following
the lead of another traveller, and in not being in a position where
necessarily the exercise of reasonable care would have revealed to
him the approaching car, distinguishes this case from *Morey* v.
*Gloucester Street Railway*, 171 Mass. 164, and *Holian* v. *Boston
Elevated Railway*, 194 Mass. 74.    Nor was he engaged in care-less sport and conduct obviously negligent, as in *Messenger.* v.
*Dennie*, 137 Mass. 197 ; *S. C.* 141 Mass. 335, and in *Mullen* v.
*Springfield Street Railway*, 164 Mass. 450.    Under the condi-tions here disclosed, it was no more to be expected that the plain-tiff's intestate would see the approaching car on a sunny day,
than that the traveller on a village road in a dark night would
observe a rapidly moving, brilliantly lighted car.    See *Evensen*
v. *Lexington & Boston Street Railway*, 187 Mass. 77.

Whether the defendant's motorman was grossly negligent was
also, in the opinion of a majority of the court, a question of
fact to be determined by the jury and could not be ruled as
matter of law.    The facts disclose such a thoughtlessness of
responsibility towards those in the car and recklessness of the
chance that a team or pedestrian from houses adjacent to the
track or from Maple Place might come upon the track, not hear-ing the noise of the car and not being warned by the gong or
bell, as to warrant a jury in finding that he was guilty of gross
negligence.    His actions did not constitute a mistaken exercise
of judgment under circumstances calling for instant action, but

a voluntary placing himself in a position where no judgment could be exercised when the exigency arose, because he deprived himself of the opportunity to realize the danger until too late to avert it. It is going too far to rule, as matter of law, that it may not be grossly negligent for a motorman to abandon control of his car while it is going at a rate of fifteen miles an hour in a thickly settled, residential district, for a period of half a minute, during which his car would proceed six hundred and sixty feet, with no pretext of excuse other than to indulge his own social proclivities with pedestrians upon the sidewalk. The fact that the motorman, although making every effort to stop his car, was unable to do so until it had gone one hundred and eighty feet, shows that the estimate of speed given by the witnesses was not exaggerated. *Evensen* v. *Lexington & Boston Street Railway,* 187 Mass. 77. *Hartford* v. *New York, New Haven, & Hartford Railroad,* 184 Mass. 365. *Galbraith* v. *West End Street Railway,* 165 Mass. 572. *Commonwealth* v. *Metropolitan Railroad,* 107 Mass. 236.

*Exceptions sustained.*