[Civ. No. 3582. Third Appellate District.—November 26, 1928.]

HECTOR PONTECORVO, Appellant, v. JOHN N. CLARK, Respondent.

Ernest M. Torchia and Walter H. Sprague for Appellant.

Joe Crider, Jr., for Respondent.

HART, J.—The plaintiff brought this action to recover damages for the death of his minor daughter, Clelia Pontecorvo, alleged to have been directly caused by the negligence of the defendant. The issues of fact were tried by a jury, and a verdict arrived at and returned in favor of the defendant. Judgment was entered accordingly. A motion for a new trial was made by the plaintiff and denied. This appeal is by the plaintiff from the judgment.

The death of the minor child named in the complaint occurred in Lincoln Park, Los Angeles, on the twentieth day of November, 1924, between the hours of 8 and 9 o'clock P. M. The defendant, John N. Clark, was, on said day, and at the place mentioned, the owner of and operating,

for amusement purposes, a mechanical contrivance or device commonly known as a "Scenic Roller Coaster Railway." This device is what may briefly be described as a tramroad, with toboggan chutes, on and over which a small train of cars is, with considerable velocity, propelled. The train, leaving a level track, ascends rapidly to the apex of what is variously described by the witnesses as "the hill," "the crown," and "the hump" (to be referred to hereinafter as the "peak"), which is at an elevation of some fifteen or twenty or perhaps more feet from the point of beginning. Reaching the top of the first peak, the train then proceeds with great swiftness, as by gravity, down a steep incline to a level surface of a few feet in length and again ascends a peak greater in elevation than the first, and, as at the first peak, and with like velocity, rounds what was described by the witnesses as a "sharp curve" on a downward slope, or with an acute "dip," and thence upwards to a third peak, and so proceeds downward and upwards, if there be other peaks, until its return to the point from which it started.

The "roller coaster," as the contrivance is commonly called, had been in process of construction for a period embracing several months preceding and down to the 20th of November, 1924 at which time it was by the defendant and his employees who constructed it deemed completed and ready for use or operation for business, and on that date it was for the first time opened to and offered for use by the public. The train running over the tramway consisted of three cars, in each of which six passengers could ride with convenience and comfort.

On the day and at the time thereof above mentioned, the deceased, then a few months past the age of thirteen years, and a girl companion named Genevieve Splitlog, who was a few months the junior of the former, entered the front car and took the front seat in that car for a trip around the tramway, each having previously purchased and received from the defendant or one of his employees a ticket entitling her to ride thereon. The other seats of the same car were occupied and the other cars contained a number of passengers. As the car in which the deceased was riding reached the top of the second peak and was making the curve at

that point the deceased fell or was thrown to the ground and almost instantly killed.

The complaint alleges:

"That at the time aforesaid the machinery, tracks, and/or cars of the defendants'· Scenic Railway were negligently and imperfectly constructed, inadequate, defective and unsafe; that said imperfection, defectiveness, inadequacy and unsafeness, could have been by said defendants discovered and known by the use and exercise by them of ordinary care and diligence, and were at the time aforesaid known to said defendants, but the same were unknown to the said deceased.

"That at the time aforesaid, and while the deceased herein was a passenger on the Scenic Roller Coaster Railway Car, and by reason of the negligent operation of the same, and the imperfection, defectiveness, inadequacy and unsafeness of the defendants' machinery, cars, and/or Scenic Railway, and further by reason of the fault, carelessness and negligence of the defendants in the operation and construction thereof, the deceased, Clelia Pontecorvo, was precipitated, cast, and thrown from the car and was bruised, mashed, crushed and killed, to plaintiff's damage in the sum of Fifty thousand dollars ($50,000), no part of which has been paid, and the whole thereof is unpaid."

The answer consists of specific denials of the material averments of the complaint, and then alleges that the deceased was herself guilty of negligence which proximately caused or contributed to her injuries and consequent death.

The plaintiff on this appeal contends: **1.** That the evidence does not support the verdict; **2.** That error was committed by the trial court in rulings allowing and disallowing certain evidence; **3.** That error was likewise committed in the giving and in refusing to give certain instructions. These points will be considered in the order in which they are thus set forth.

It will be observed from the complaint that the negligence solely relied upon by the plaintiff is the alleged faulty or defective construction of the roller coaster. It is true that it is also alleged that the device was negligently operated, but there is no evidence that it was negligently operated, except in so far as it might be said that it was so operated because of the alleged defective construction

thereof. In other words, there is no evidence showing that the operation of the contrivance was not in the usual or regular manner of operating such a mechanical device, where such device is not so defectively constructed as to subject, solely by reason thereof, persons riding in its cars to greater risk or peril than is usual to or inherent in such mechanical contraptions.

The court instructed the jury that the rule of *res ipsa loquitur* applied to the case, and that, therefore, the plaintiff having made a *prima facie* case by proof of the happening of the accident in or by which the deceased was hurt and as a consequence killed, the burden was thereupon cast upon the defendant to show that it was not his negligence which was the proximate cause of the accident, or, more accurately expressing the proposition, to introduce evidence sufficient to overthrow the presumption that it was his negligence which was the direct cause of the accident and its deplorable consequences.

The complaint does not explain specifically how or in what particular manner the accident happened. The use of a number of adjectives therein as descriptive of the cause of the accident amounts to no more than a general allegation of negligence. Reduced to their real purport, the allegations as to the cause of the accident are merely tantamount (and nothing more) to the general statement that the device was defectively constructed and, therefore, unsafe for use. To take this case out of the doctrine of *res ipsa loquitur*, the particular respects in which the contrivance was defectively constructed, and for that reason in no condition to be used with safety, and that such particular defectiveness was the proximate cause of the accident, should have been explained and alleged in the complaint or shown by the plaintiff's evidence. (*Connor* v. *Atchison, Topeka & Santa Fe Ry. Co.,* 189 Cal. 1, 5 [26 A. L. R. 1462, 207 Pac. 378]; *Marovich* v. *Central Cal. Trac. Co.,* 191 Cal. 295, 305 [216 Pac. 595].) And the evidence presented by the plaintiff is not by any means satisfactory as to the specific cause which directly caused the mishap.

It is not necessary to present herein the testimony of all the witnesses introduced by the plaintiff to support the presumption of negligence on the part of the defendant. There were nine of such witnesses, of whom some were riding on

the train when the accident happened and others witnessing it from a hill on which they were then standing and watching the train as it was making its circuit, the hill being approximately 150 feet from where the coaster was maintained. The testimony of all these latter witnesses was substantially the same, and in a more or less degree corroborated the testimony of those who were riding on the train at the time the deceased fell or was hurled therefrom to the ground. It is, hence, sufficient to reproduce herein, in an abbreviated form, the testimony of two of the witnesses riding on the train when the accident occurred as probably involving a more accurate description of the action of the train as it moved over the tracks than would the testimony of those witnesses not on the train.

The witness William Wheeler, a young man, testified that he was a passenger on the coaster at the time of the accident, occupying, with a "boy friend," the second seat in the front car and sitting immediately back of the deceased and Miss Splitlog. He stated that, as the passengers were entering the cars, an attendant cautioned them to "hold on tight and stay in their seats," referring to the time that the coaster was in operation. He described the movement of the train, particularly the action of the car in which he, his companion, the deceased and Miss Splitlog were riding, as follows: "It (the train) started up the incline, got up to the top, around the turn. We went down the first dip. We come to the top of the second dip (or peak), and the incline was steep there and there was a sharp turn. . . . When it (the train) comes up it throws you back and then there is a sharp turn and then you go right over that. . . . Everybody in the car, when they got to the top of the dip (referring to the second peak, where the deceased was thrown or fell from the car) went forward. . . . Right at the top (of the second peak) it seems like when the first car gets started down, the third car is not quite up the incline yet. The third car seems to hold the first car back." He stated that there was "a very bad jerk" of the train as it reached and was rounding the curve at the second peak, and that it was there that the child was thrown or fell from the car. He further testified that the deceased was sitting when precipitated from the car. At one time he stated that he could not and did not see her hands or where she had

them and at another declared that she was holding on to the iron bar or rail maintained immediately in front of both seats in each of the cars for the purpose of enabling the passengers to hold themselves in their seats against the peril necessarily incident to the swaying and jerking movement of the train as it rounded the curves at the top of the peaks or higher points of the tramroad. He testified that the deceased was thrown head foremost from the car to the ground.

Genevieve Splitlog, the companion of the deceased on the occasion in question, and approximately of the same age of the latter, testified that she and the deceased had ridden in the coaster on the evening of November 20th, on a trip immediately preceding the trip on which the deceased was thrown or fell from the car; that on the first trip they occupied the last of the three cars constituting the train; that on the first trip she did not notice the sharp or severe jerking movement of the car in which they were riding at the curve rounding upward and downward the second peak or hill that she experienced or noted in the action of the car on their second trip; that the jerking and swaying movement of the car on the second trip caused her (witness) to be raised from her feet about seven or eight inches, and that it was then that the deceased "fell out." She testified that "we were barely able to get our hands around" the iron rail in front of them; that they were compelled to "bend over to hold on to the rail," and that their feet "could hardly touch the bottom of the floor"; that "we just put the balls of our feet on the floor, but our heels could not touch." Referring to the height of the iron railing in front of the seats of the cars, she stated that it would, when she was standing, reach as far as her hips; that as she and the deceased were about the same height, the railing would probably reach no farther than the latter's hips. The witness stated that at the time she was thrown from the car the deceased was not standing and that she was holding to the iron bar. She further testified that she had on previous occasions ridden on roller coasters between which and the one concerned herein she had noticed no difference in their general construction and mechanism, or in the manner of their operation; that, so far as she knew, no part of the machinery became impaired on the

trip, and that the iron rail and the seats of the car were not injured or damaged. She stated that there was a sign maintained at and near the coaster which read: "Do not stand up," and that before or as. they were getting on the train, "the gentleman who started the car told" the witness and the deceased "to hang on tight and keep in your seats." She testified, as did all the witnesses, that the three cars constituting the train contained passengers on the trip on which the deceased was thrown to the ground, and that all the passengers other than the deceased remained in their seats and were safely returned to the point from which the train started.

To the above it should be added that all the plaintiff's witnesses, both those riding on the train and those watching it from outside, stated that, at the second hill, where the deceased left the car, the curve or angle was sharper or more acute than were the curves or angles at any other of the higher points on the track, and that at that curve the jerking or lurching movement of the train was more positive and noticeable than at any of the other curves.

The testimony introduced by the defendant is, in substance, well and accurately set forth in the brief of the defendant, and as thus presented it may here be given:

"A. F. Pfahler, a witness called on behalf of defendant, testified that he was a police officer on the 20th day of November, 1924, the date of the accident, and that he made an investigation the morning following the accident, to-wit, on the 21st, that he investigated the track, that he climbed up over all the structure on the track and examined it, that he had pointed out to him the point where the accident happened, and that he went up there; that he did not find anything broken; that he examined the track, but did not find any portion of it broken; that he examined the track from the bottom of the second dip clear up to the top, and that he did not find any irregularity in the track, and that he made a regular report to the police department. On cross-examination he stated to Mr. Sprague that he rode up over the track the day he made his investigation.

"E. W. Thomason, a witness called on behalf of defendant, testified that he was a police officer on the Los Angeles police force on the date of the accident; that he made an investigation the day following the accident. 'The Court:

. . . What examination did you make? A. We went all over the structure. The Court: What examination did you make at or near this point that this accident is said to have occurred? What did you do? A. We climbed over the structure and looked it over from top to bottom. By Mr. Crider: Did you look over the track? A. Yes, sir. Q. In looking over the track did you find any broken place? A. No, sir. Q. Did you find any plates broken at all? A. No, sir. The Court: Did you find any buckled plates? A. No, sir. Q. By Mr. Crider: In looking over that No. 2 plate, did you find any angle in that any place on it? A. I don't know just what is meant by that angle. The Court: Is there a curve there? A. There is a curve, yes. The Court: Without reference to the degree of the curve, was it just one big curve? A. It just seemed to be one big curve. Q. Did you examine the car? A. Yes, sir. Q. What did you examine about it? A. All of it, wheels, bottom, top. Q. Did you find anything broken on it? A. No, sir. Q. Did you examine all wheels? A. Yes, sir.' On redirect examination this witness testified that they walked all over the track, that they looked underneath all the way around and that they looked at the bottom as well as the top to see if there were any breaks anywhere. 'The Court: But you didn't look at the structure, the underpinning? A. Yes, to see if the braces were all in shape, nothing broken. Q. By Mr. Sprague: What day was that? A. The day after the accident happened.'

"W. S. Hudson, a witness called on behalf of defendant, testified that he was a police officer at the date of the accident, employed by the city of Los Angeles; that he made an investigation of this accident and that he arrived at the scene of the accident the same evening and shortly thereafter; that he made an investigation of the structure and track at the point where the accident occurred; that he went all over the top and looked for any defect in workmanship, but that he did not find any, there being no breaks or bent plates. 'Q. Did you see what was on that dip? Did you find any angle there of any kind? Just describe how that was. A. Well, it was an arch. The Court: Was it a regular curve? A. It was a regular curve, yes, sir—an arch. The Court: Was there any irregularity in the curve? A. No, sir. Q. By Mr. Crider: Did you go clear up on

top? A. I did the next day. Q. Did you find anything wrong? A. No, sir. Q. Did you look at the track? A. Yes, sir. Q. All along? A. Yes, sir. Q. Did you look at the car wheels? A. I did. Q. Did you find any break or defect there? A. No, sir.'

"Fred Morf, witness called on behalf of defendant, testified that he was employed by the defendant Clark at the time of the accident; that on the day of the accident and prior thereto, he rode on the train at least 15 or 20 times; that he did not notice anything wrong in the way the car rode; that he did not notice anything different with reference to place No. 2, there being nothing different there than at the other places he went over. This witness further testified that the track and course were tested in the morning, that they were first tested by loading the cars with weights made of iron which were sent around to see if the structure were safe in every way; that they sent the train loaded with weights around four or five times; that he had helped in the construction of other roller-coasters, having worked on about fifteen different ones; that the roller-coaster was finished in the morning and that they did their testing in the morning and afternoon.

"Allie F. Groff, a witness called on behalf of defendant, testified that she rode on the coaster the day that the accident happened in the afternoon, probably ten or twelve times; that she did not notice anything unusual in the way of motion, or of that kind in the car; that she had ridden on coasters before and did not notice any irregularities of any kind as she rode around; that she personally knew that they had sent cars loaded with weights over the track in the morning.

"Antone Balagno, a witness called on behalf of the defendant, testified that he was a carpenter employed in the construction of the railway; that he was there the day the accident happened; that he rode over the coaster earlier in the day about twelve times; that he did not notice anything unusual in the way it ran; that it did not run any different at No. 2 place than it did at any other elevation; that on the earlier trips he made in the afternoon, a full train of about eighteen made the trip.

"John N. Clark, defendant, testified in his own behalf that the cars used had been used before and thoroughly

tested out, and also had been used on a different scenic railway, located at Venice, California; that the cars were thoroughly inspected before they were put on the track for use, having been thoroughly gone over and oiled; that before the railway was opened for use it was absolutely finished except to put a small hand-rail on one side, that is, along the side of the walk where the track-walker could walk to inspect the track; that he had ridden on the coaster himself before it was open to the public; that after the track was open to the public and before the train was run on which plaintiff's daughter was riding that approximately 350 had been taken over the dip. Clark stated that there was not 'anything unusual about the way it (the coaster) rode when he rode on it'; that there was 'not any difference at hump No. 2 than at any of the others.'

"Charles Paige, a witness called in behalf of the defendant, testified that he was employed in the capacity of a builder of this particular coaster, that the coaster was entirely completed before it was put into use, except the placing of some lights and the hand-rail hereinbefore referred to. 'Q. By Mr. Sprague: You mean to say that when this ride was finished that night that nothing else was to be done? A. I said there were a few minor details. Q. What were those few minor details? A. The lamps were only hooked up temporarily; the hand-rail—a few pieces of hand-rail along, and the emergency brake.' "

But little reflection, upon reading the testimony given by defendant's witnesses, and of which the foregoing embraces a synoptical statement, is necessary to force the conclusion that this court cannot declare, as a matter of law, that the plaintiff's *prima facie* case, even as bolstered, to a certain extent, by the testimony of his witnesses, was not overcome by the defendant's proofs. The whole question was one for the jury. An elaborate analysis herein of the testimony is not required to show that we must abide by the result arrived at by the jury. We may, however, emphasize a few of the facts, which, it is to be presumed, the jury gave special attention to and found. Among these is the fact that, so far as the record advises us, the coaster was constructed exactly as all such devices are constructed and under the direct general supervision of the defendant, who had been engaged for many years in the business of operat-

ing such machines. No witness for the plaintiff testified to the contrary. Furthermore, the coaster was thoroughly tested on the day of the accident and before it was opened to use by the public, first, by loading the cars with iron and other heavy materials, and, second, by certain of the defendant's employees, who assisted in the construction of the machine, and who, on the day of the accident, rode in the cars and made some ten or twelve trips on the train, before the public was permitted to use it, and that they found it to work as well and safely as is usual to such devices. Again, important is the fact that several persons, shortly after the accident—one the same evening and the others the following day—subjected the coaster to a scrutinizing inspection, "from top to bottom," as one of the witnesses declared, and found it perfectly intact in all its parts, no damage or defect in the machinery having been discovered. And it is a circumstance of no little significance that, out of the eighteen passengers on the train at the time of the accident, the deceased was the only one thrown from the car. It must also be kept in mind that those of the defendant's witnesses who rode on the coaster before the public was permitted to use it testified, as did the defendant, that the movement of the train when passing over and around the several peaks was uniform—that is to say, that the jerking and swaying movement of the coaster at the second peak and dip was no more acute and sudden than it was at the other peaks and dips, and that such movement was not at any of the higher points on the tramway more severe or keen than is usual to all such devices. In fact, Miss Splitlog, who, as seen, testified that the jerking movement of the car at the first peak was not as sudden and abrupt as at the second peak, stated that on the first trip she and the deceased made, the jerking movement of the train at the latter peak and dip was not more severe and sudden or acute than it was at the first peak and dip.

From the foregoing review of the evidence, it must be clear that it was for the jury to determine whether the death of the little girl was proximately caused by and through the culpable negligence of the defendant, or whether the deceased, in that she failed to exercise the amount of care to preserve her own personal safety which the circumstances and conditions by which she voluntarily surrounded

herself imperatively required of her, was herself guilty of negligence which proximately caused or contributed to the accident and its distressful consequences. But it is said, or at least intimated, that the fact that the deceased was a mere child imposed upon the defendant a greater amount of the degree of care than is required of an operator of such a device in the case of an adult. While it is true that the same act which would be negligence in an adult may not be such if done by a child, still it is also true that "a child is required to exercise the same degree of care that would be expected from children of his age, or which children of his age ordinarily exercise. (*State* v. *Baltimore etc. R. R. Co.*, 24 Md. 84 [87 Am. Dec. 600]; *Collins* v. *South Boston R. R. Co.*, 142 Mass. 301 [56 Am. Rep. 675, 7 N. E. 856].) . . . 'Children, as well as adults, should use the prudence and discretion which persons of their years ordinarily have, and they cannot be permitted with impunity to indulge in conduct which they know, or ought to know, to be care-'less. The law imposes upon minors the duty of giving such attention to their surroundings and care to avoid danger as may fairly and reasonably be expected from persons of their age and capacity. (*Merryman* v. *Chicago etc. R. R. Co.*, 85 Iowa, 635 [52 N. W. 545].) In the present case, the capacity and the intelligence of the child are not controverted, and he must be presumed to have had all the qualities ordinarily belonging to a person of his age.' " (*Studer* v. *Southern Pacific Co.*, 121 Cal. 400, 404, 405; see, also, *Bolar* v. *Maxwell Hardware* Co., 205 Cal. 396 [60 A. L. R. 429, 271 Pac. 97], and *Moeller* v. *Packard*, 86 Cal. App. 315 [261 Pac. 315].)

In the instant case, the minor was past the age of thirteen years. She had previously and on the evening of her death ridden on the same coaster and at other times on similar devices. That she was a girl of normal intelligence and of more than usual ambition of children of her years to develop their intellectual powers, is shown by the testimony of her father, the plaintiff herein. He testified that the deceased, before he moved to California, attended the public schools at Niagara Falls; that, on locating in California, some three or four years prior to the trial, she not only attended a public school at Los Angeles, but received instruction in the costumer's art at an art school in said city,

and, further, received lessons in the costumer's art through a correspondence school; that, at the time of her death, she had made such progress in her art studies that she was able efficiently and skilfully to make models for costumes suitable for use by histrions in moving pictures as well as those engaged in the real dramatic art itself. These models, testified the plaintiff, who was a tailor by occupation, were used by him to make costumes for the purpose mentioned, and without them, he said, he could not have carried on his business as a tailor specializing, as he then was, in such costume making. A photograph of the deceased, taken a short time before her unfortunate death, is presented in the transcript, and, in so far as a photograph of a person can reflect mental character and physical condition, the picture indicates a singularly prominent degree of intelligence and sound and vigorous physical health and strength. But regardless of this latter consideration, it is perfectly clear from her father's testimony that she was intelligent beyond the average of minors of her age.

We have now pursued a sufficient discussion of the evidentiary branch of the case. The verdict, upon the evidence, is binding upon this court.

It is claimed, however, that it must be held as a matter of law that the defendant was guilty of negligence which was the direct cause of the accident, "especially in the case of children," in that he failed to provide the cars "with straps or other safety appliances to hold the passengers to their seats while going over the dips and 'bumps,' or to furnish attendants to ride in the cars and protect the passengers from being thrown out of the same." This, it is contended, was a duty resting upon the defendant by virtue of the terms of sections 2100 and 2101 of the Civil Code. Those sections promulgate rules relative to the duty of common carriers, it being claimed by the plaintiff that the defendant, as the operator of such a device, was and is a common carrier within the contemplation of the code rules (Civ. Code, secs. 2100 and 2101) establishing the degree of care and diligence required of such carriers for the safe carriage of their passengers. (See *Treadwell* v. *Whittier*, 80 Cal. 574 [13 Am. St. Rep. 175, 5 L. R. A. 498, 22 Pac. 266]; *Champagne* v. *Hamburger & Sons*, 169 Cal. 683, 690 [147 Pac. 954].) At the trial the defendant's counsel

conceded that in personal injury cases such devices were to be treated as such carriers, and the trial court instructed the jury upon that theory. We will, therefore, treat such devices in the consideration and decision of this appeal in accord with that theory, without, however, intending to hold, or deciding, that they are common carriers within the code rules mentioned, it not being necessary herein to pass upon that question, since in either aspect of the proposition the final result arrived at herein must, according to our view, be the same.

Section 2100 of the Civil Code reads: "A carrier of persons for reward must use the utmost care and diligence for their safe carriage, must provide everything necessary for that purpose, and must exercise to that end a reasonable degree of skill." Section 2101 reads: "A carrier of persons for reward is bound to provide vehicles safe and fit for the purposes to which they are put, and is not excused for default in this respect by any degree of care."

There is no evidence that the cars were not equipped with all the appliances or means for protecting passengers which are usually or ordinarily provided for or necessary to be employed in the operation of such conveyances or vehicles. The iron bar or rail in each car and in front of the passengers was specially designed to enable passengers to hold themselves in their seats against the "jerks" and "bumps" naturally characteristic of such a contrivance when in motion, and, so far as this record discloses, was all-sufficient for such purpose. If it be answered that the fact that the deceased was thrown from the train is evidence of an absence of sufficient safeguards against accidents to the passengers, the reply is that the deceased was the only passenger hurled to the ground and that seventeen others, including several young people, particularly her seat companion approximately of her own age, remained in their seats and were returned safely to the starting point of the train. The same observations apply to the suggestion that it was the duty of the defendant to provide the cars with attendants while the train was in operation to prevent the passengers from falling therefrom. As to this, it may further be said that the method of operating a "scenic railway," as such devices as the one in question are commonly called, is a matter of common knowledge, to which the courts are not required to

close their eyes. "We, as a court, are not more ignorant than the general public. What is generally known we must know." (*Pointer* v. *Mountain Ry. Const. Co.*, 269 Mo. 104 [L. R. A. 1917B, 1091, 189 S. W. 805, 813].) From this common knowledge, we can say that it is not the custom or necessary to assign attendants to the cars of a device such as the one involved herein for the purpose of preventing passengers from falling from the cars while the train is in motion.

■ The next assignment involves the complaint that the court refused to allow in evidence certain photographs of the coaster, some of which were taken the day following the date of the accident and others at some subsequent time. The theory upon which the photographs were offered was, as stated in the brief of plaintiff, that they would show that at the time of the accident the device was not completed and was, therefore, unsafe for use. Special emphasis is laid upon those of the rejected photographs showing men at work about the coaster the day following the accident, the claim being that they constituted competent evidence to substantiate the contention by plaintiff that the machine was not fully prepared for use at the time it was first opened to use by the public. There was no denial of the testimony introduced by the plaintiff but, in effect, an admission of the truth thereof that on or about the device men were at work on the day following that of the accident. Hence no prejudice can be claimed against the ruling rejecting the photographs, even if it be assumed that it involved error. The other rejected photographs showed the character of the general mechanical construction of the device. This is true of other photographs of the machine which were received in evidence. They were a photographic reproduction of the device from different points of view, and, manifestly, could not show any defects in the machinery, if any there were. They were serviceable in the trial of the case only in so far as by means thereof the particular part of the device where it was claimed that there were defects or broken parts might be pointed out and located.

■ The plaintiff called a witness in rebuttal and asked how many times the train had made the circuit of the tramway "at the time of the accident." Objection by defendant that that question did not call for testimony properly

rebuttal was sustained. That question was fully gone into by the plaintiff in his original case. It has been often held, and with obvious legal propriety, that it is improper to allow witnesses to reiterate the testimony previously given by them in the original case under the guise of rebuttal. (See *People* v. *Van Ewan,* 111 Cal. 144, 149 [43 Pac. 520]; *People* v. *Peccole,* 92 Cal App. 470 [268 Pac. 473, 479].) And the general rule may be stated to be that rebuttal or surrebuttal testimony, strictly speaking, is receivable only where new matters have been developed by the evidence of one of the parties after his case in chief has been made and concluded, although it is within the discretion of the trial court to allow a party, on "rebuttal or surrebuttal," to introduce evidence with respect to relevant and material matters as to which his witnesses have testified in chief. In the instant case, however, as we have in effect stated, the evidence offered as "in rebuttal" was cumulative of relevant evidence to the same point received in plaintiff's case in chief, and it cannot, therefore, be held that the court, in disallowing it, transcended the limits of a sound discretion.

The defendant and the latter's witness Paige, the builder of the coaster, testified that, before the device was opened for use by the public, it was completed, except "in a few minor details," viz.: the lights were not permanently attached to the machine and the hand-rail around or along the board walk on which an attendant might walk, if he so desired, or if at any time for any reason it was found necessary, was not completed. Paige, on cross-examination, was asked: "Now, you say this roller coaster was finished, Mr. Paige? A. I do, except in a few details. Q. Just a few small details? A. Yes. Q. No major repairs were necessary to be made? A. No, sir. Q. And you didn't make any major repairs after this accident took place?" To this last question objection was interposed on the grounds that "it is incompetent, irrelevant and immaterial." The question constituted cross-examination, and the witness should have been permitted to answer it, but no prejudice followed from disallowing it, since the record shows that, on both direct and cross-examination, the witness in effect stated a number of times that, save in a few particulars, in no degree or manner affecting the matter of safety in oper-

ating the train, the device was finished and in proper condition for use by the public. Besides, the witness' answer to counsel for plaintiff that "no major repairs were necessary to be made," was the equivalent, practically, of the statement that he did not make any "major repairs" after the accident. And thus a sufficient foundation was laid for the impeachment of the witness on that subject, if plaintiff was prepared to pursue that line of attack upon the witness and his testimony.

There are several other assignments involving attacks upon certain rulings upon evidence. An examination of those assignments has convinced us that they are without sufficient merit to entitle them to special notice herein.

Both the plaintiff and the defendant proposed a large number of instructions covering every phase of the case as it was made by the pleadings and proof. The court rejected all the instructions so proposed, and in lieu thereof *sua sponte* charged the jury fully and correctly upon every principle of law pertinent to the issues framed by the pleadings and introduced by the evidence which was declared in the rejected set of instructions proposed by the parties themselves. There are, however, embraced in the court's charge two instructions which plaintiff insists misstate the rules of law thereby sought to be announced. The first of these is based upon section 2100 of the Civil Code, and states, among other things, that a railway such as the one herein involved, being "a common carrier of passengers," within the meaning of the code section just named, it is "incumbent upon such carrier to exercise the *highest degree* of care and caution for the safety of its passengers," etc. The specific criticism of said instruction is that the "highest degree of care" which the instruction declares that it is incumbent upon a common carrier to exercise for the safety of its passengers does not square with the rule as it is stated in section 2100 upon that subject, which, as is to be noted, expresses the degree of care in such cases as the "utmost" care. There can be conceived no greater care than the "highest" care. Nothing can go beyond the highest. The adjective "utmost" can describe nothing higher or greater than the highest or the greatest. The adjective "highest" is the superlative of the adjective "high." And our dictionaries say that the adjective "utmost" means "the greatest or highest

degree, quantity or number." The noun is defined: "The most that can be; the greatest power, degree or effort." It is well said in the cases that "the expression, 'highest degree of care,' is no stronger than the statutory requirement, 'utmost care.' The instruction in this regard was not error." (*Osgood* v. *Los Angeles etc. Co.,* 137 Cal. 280 [92 Am. St. Rep. 171, 70 Pac. 169]; *McCurrie* v. *Southern Pacific Co.,* 122 Cal. 558 [55 Pac. 324].) The converse of the proposition stated in the instruction (and the instruction so implies) is, necessarily, that for the slightest neglect against which "human care and foresight might have guarded," if such neglect was the proximate cause of the death of the deceased, the defendant would be in law responsible. (*Champagne* v. *Hamburger & Sons,* 169 Cal. 683, 690 [147 Pac. 954].) ▮ The other instruction complained of reads: "The defendant was not an insurer of the safety of the deceased at the time the accident in question occurred." The case just named is cited as holding that the instruction involves an incorrect statement of the rule. The instruction in that case properly enough stated that common carriers were not "insurers of the *absolute* safety" of their passengers. The word "absolute" was, as seen, omitted from the instruction here, and that omission constitutes substantially the only difference between the two instructions, if, indeed, such omission is a juridical concept constitutes a material difference. In the *Champagne* v. *Hamburger & Sons* case substantially the instruction hereinabove first considered and the instruction now under review were given as one instruction. The two legal propositions stated in the instruction there are here stated separately or in two distinct instructions; but, obviously, the two instructions should be viewed or considered together, or in connection with each other, and if, as so viewed, they may rationally be so construed as that they fairly and intelligently state the true rule as to the degree of responsibility which common carriers must assume in safeguarding their passengers against accident or injury, then, of course, there is no real ground for complaint. Reading the two instructions in this case together, they fairly and with sufficient clarity state the principles of law to which they are addressed in the following form, which is substantially in the form in which they are separately given in this case:

"While common carriers are not insurers of the safety of their passengers, they are bound to exercise the highest degree of care and caution for the safety of their passengers, and *to do all that human foresight and vigilance can reasonably do*, consistent with the mode of conveyance and the practical operation of its rule, to prevent accident to their passengers while riding on their cars." The difference between the statement that common carriers are charged with the highest care to protect or preserve the safety of their passengers and the statement that such carriers are not insurers of the absolute safety of their passengers, is merely verbal and involves the statement of practically the same rule of law as applicable to common carriers in an affirmative and a negative form. The slightest neglect cannot be the highest care, so when it is said that common carriers are charged with the highest care to protect the safety of their passengers it necessarily means that they are insurers of such safety as against the slightest neglect. We, therefore, think that the two instructions referred to, read together, with sufficient clearness explain the duty common carriers owe to their passengers in the matter of safeguarding them against accident or injury as such duty is set forth in section 2100 of the Civil Code.

The judgment is affirmed.

Finch, P. J., and Plummer, J., concurred.