GEORGIA BROWN, RESPONDENT, v. WINWOOD AMUSEMENT COMPANY ET AL., APPELLANTS.—34 S. W. (2d) 149.

Kansas City Court of Appeals. January 5, 1931.

*John C. Nipp* and *E. E. Thompson* for respondent.

*Ingraham D. Hook, Carl E. Enggas* and *Franken & Timmons* for appellant.

BLAND, J.—This is an action for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $2500. Defendants have appealed.

The facts show that plaintiff, who was a telephone operator about twenty-three years of age, was injured on July 14, 1928, while riding upon a roller coaster at Winnwood Beach near Kansas City. At this place defendants operated an amusement park wherein were situated various concessions, including the roller coaster in question. This device consisted of two steel rails laid two and one-half feet apart upon which small cars, or trains of three cars each, were operated. These cars each had four seats and seated eight passengers. The cars were coupled together in such a manner as to prevent them "from jamming back and forth into one another." The track was from a half mile to a mile long and ran up over summits or humps, down dips and around curves. The purpose of the ride was to give "thrills" to the customers. When a train was loaded the cars were pushed down a slight dip, around a curve and were then picked up by an endless chain which hoisted the train to the top of the first summit or hump about seventy-six feet from the ground. After reaching the first summit the train was turned over to the law of gravity. No further mechanical aid in the operation of the train around the track was used. From the first summit the train descended a decline and its speed and momentum carried it

up| the next incline to the top of the next summit when it descended another decline and so it continued to the point of beginning. There were seven summits altogether. Each successive summit was lower than the preceding one so that the last decline was only fifteen or twenty feet from the ground. The trains, after leaving the last dip would begin to slow down.

The train was headed north when it started from the first summit, then it went south, west and east back to the point of beginning. No attendant was stationed upon any of the cars. The last curve, before the train came back to the starting point, was between the latter point and the last hump or dip and was about fifty or sixty feet from the first set of brakes which automatically operated to stop the train at the end of the journey. Attached to the back of each seat and parallel thereto was a handle consisting of a round piece of metal or steel projecting into the car eight to eleven inches. This was provided for the passengers to hold to during the ride. Each car was equipped underneath with eight steel wheels, four of which ran upon the track and the other two were "underslung" wheels. These latter wheels ran underneath the track in order to hold the car upon the track when it reached the summits or humps for at that time the car, as it started downward, had a tendency to continue its upward climb. The bottom wheels were also spoken of as friction wheels which were also brought into use when the car was making a curve at which time these wheels ran against a third or side track.

The cars were stopped at the end of their journey by means of what is known as "squeezer brakes" which were three in number. None of these was attached to the cars but operated against the brake shoes upon the cars. The first one of these brakes acted automatically to check the speed of the train. The train then proceeded about two feet further when it entered into another braking apparatus controlled by the brakeman there present by the use of levers. There was a safety rachet on the upward side of the various inclines to automatically catch a car or train should anything occur to cause them to run backward. There was no safety device on the declines.

Plaintiff and two girl companions and three young men, on the day in question, visited the roller coaster and two of the couples proceeded to take a ride thereon, the other staying behind because they were afraid. Plaintiff was seated in the center of the middle car with one Eddie Burgess and the other couple, consisting of Mr. Burnett and Miss Keller, were seated behind them in the same car. Burnett paid the requisite fare for the four. There was another couple on the train not in plaintiff's party. No untoward circumstances transpired until the train reached the last curve. At this point the car in which plaintiff was seated gave a quick, sudden and

unexpected jerk, raising her almost to a standing position and throwing her with her right side against the iron rod in front to which she had been holding with both hands, striking her right hip. This resulted immediately in her suffering a severe pain in her side, her back hurt and she was sick, nauseated and felt faint. Her side and abdomen became inflamed and later her appendix was removed. When she arrived at the unloading place the attendant gave her the name of a doctor and asked plaintiff her name.

Plaintiff described the movement of the car at the time she was injured as follows: "It gave a quick, sudden, unexpected jerk and threw me against the car and it raised me almost to a standing position and then it threw me against the rod." She testified that when the car gave the unexpected jerk it sounded like "something dragging." "It sounded like the wheels locked." "It made kind of a grinding noise." It was a "loud sound." On cross-examination she testified that she had never heard a sound made by locked wheels and did not know what the sound of locked wheels was like but "that's just the way I thought of it as." She was asked whether that was a "figment of her imagination," and she answered, "yes." We take her testimony to mean that, while she had never heard a noise made by locked wheels, she imagined the noise that occurred at this time was of that nature. She had ridden upon this coaster on one occasion before, or on July 4, 1928. In describing the jerk which occurred when she was injured she said it was a much harder, a more sudden and violent jerk than any she had before experienced while upon the coaster and that when she rode before there was no jerk at the place where the one in question occurred.

Plaintiff further testified that, when she was upon the coaster the first time, she received "certain jerks and certain jars" and that when she went upon it at the time she was injured "I expected to be in jarred a certain amount;" that the reason she held on to the bar in front of her was to reduce the shock to her body caused by the jerks. However, as before stated, she testified that the other jerks she received were nothing to compare with the one at this time and that even Burgess and Burnett "got a terrible jar" and that Burgess was hurt slightly but neither was injured like she was.

As to the exact point where the violent jerk occurred plaintiff testified that it happened "about at the last dip or turn;" that she did not know exactly but thought it was about thirty feet from the unloading platform; that the last dip occurred when the car was going east, but that when she was hurt it was going north. Taking her testimony as a whole we conclude that she was injured when the car was making its last turn after leaving the last dip.

Plaintiff's witness, Mildred Womack, testified that she was a friend of plaintiff's and was one of six persons who visited the coaster at the time plaintiff was injured but that she and her escort

did not go upon it at that time. She testified that she had taken two rides upon the coaster on July 4, 1928, two prior to that time and seven or eight rides since and that the cars were usually full when she rode; that she experienced no severe or violent jerks or anything unusual; that the train "went up and down dips, around curves and ran very smoothly all the way around, only going up and down."

The witness Burnett, testified, by deposition, that the roller coaster was "a succession of ups and downs and turns and jumps;" that it made "sharp turns and curves;" that at the time plaintiff was injured the car was on the last turn and about twenty-five or thirty feet from the end of the ride; that at this time there was a "sort of grinding noise, or something like that, it seemed to jerk more than usual right at that particular time, . . . it was more unusual than any of the others, more violent;" that such an unusual and violent jerk was not expected by him; that the curve "didn't seem to be any more sharp than the others;" that he had not ridden the coaster before or since; that the jerks that he received prior to the one that caused plaintiff's injury were not as short and abrupt; that as to the other jerks "you can notice it but that is all; that he was "holding pretty good and it threw me too;" that he was not injured but was jarred; that no one in the car, other than plaintiff, claimed to have been hurt; that the jerk in question was not at the dip but was on the curve just when they "were making the home stretch;" that the car had made the dip and was coming up on "to the home stretch;" that this was the only unusual jerk made by the car during the whole trip.

It was shown that the testimony of Miss Keller and Mr. Burgess was not available.

There was testimony on the part of defendants' witnesses tending to show that the construction of the roller coaster track made a "smooth running surface;" that the last curve in the track was after "you have made" the last hump.

Defendants' witness, Duncan, testified that when a car made a curve the tendency would be to throw a person in the direction of the curve and that it did not have a tendency to throw one out of his seat in an upward direction; that "the car going to the left would naturally, as it comes around here (indicating), you would lean with the car. *It doesn't go with a jerk.* It comes on a great big smooth track. Naturally you lean over to it. If the curve is over to the right, you will naturally lean over to the right." The witness was asked:

"Whatever this car, I am assuming that if this car coming around this curve, taking the last curve over at Winnwood, that if it does make a sudden, violent, unusual jerk with such force that it does throw a person up out of the seat against this iron rod, then I'll ask

you in your opinion which way that person's body would naturally go, to the left or right?"

He answered:

"I don't see how a ride, unless it's broken, could possibly be in that condition, because those turns are made big and swinging."

There is other evidence on the part of defendants tending to show that the coaster was built in the spring of 1928; that its construction was under the supervision of an engineer who had built and designed similar structures throughout the United States and that he was recognized as one of the foremost coaster builders in the country; that the coaster in question had been in operation about six weeks at the time plaintiff was hurt; that when it was completed it was three or four days before any member of the public was permitted to ride upon it; that it was built of the best material; that the attendant, on the day following plaintiff's injury, made a minute inspection of the entire apparatus, including the cars, and found nothing wrong with them; that the coaster continued to operate on the night plaintiff was injured for more than three-quarters of an hour; that the same car was being used and nothing was found to indicate what caused plaintiff's injury; that during the season of 1928 approximately 125,000 people rode on the coaster; that no one was injured other than plaintiff so far as the witnesses knew, and they were in a position to know.

The petition alleges negligence in the most general terms, plaintiff relying upon the *res ipsa loquitur* doctrine for recovery.

It is contended by the defendants that the court erred in failing to give their instruction in the nature of a demurrer to the evidence. In this connection defendants urge that there is no room for the application of the *res ipsa loquitur* doctrine and, even if there were, there is not sufficient evidence of an unusual occurrence to permit plaintiff to go to the jury. In arguing the question of *res ipsa loquitur* defendants state that they were not in the transportation business; that "their business was carrying merry-makers in their park; that the coaster was in plain view and open to the public for inspection; that if anything went wrong with it plaintiff was in as good a position "to state what went wrong as defendants."

There have been several cases before the higher courts of this country involving devices similar to the one in the case at bar and, while the courts have been slow in holding that the operator of such devices is technically a common carrier and that all the rules governing such carriers are applicable to him, they do hold that the rule in reference to the degree of care required of a common carrier applies to the operation of such devices; that the apparatus is under the control and management of the operator thereof and where the accident is such as does not happen under the ordinary course of things, if those who have the management of the apparatus use

proper care, reasonable evidence is afforded, in the absence of explanation by the defendant, that the accident arose from want of such care. In other words under such circumstances the doctrine of res ipsa loquitur does apply. [Bibeau v. Pearce Corp., 217 N. W. 374. (Minn.); O'Callahan v. Dellwood Park, 89 N. E. 1005 (Ill.); Sand Springs Park Co. v. Schrader, 198 Pac. 983 (Okla.); Best Park Amusement Co. v. Rollins, 68 So. 417 (Ala.); Pontecorvo v. Clark, 272 Pac. 591.] Of course, it is necessary in such cases to show that the movement of the device was extraordinary for that particular mode of transportation.

Defendants cite a large number of freight train cases involving the question of what consists of a proper discharge of their duty to use care by railroad companies in transporting passengers on freight trains and defendants compare the movement of the device in question with that of freight trains which normally move with bumps, jerks and jars. The distinguishing feature between these two classes of cars or trains is that the bumps, jerks and jars of freight trains normally very well may be of a severe nature tending to injure persons, while the evidence shows that the normal bumps, jerks and jars of the roller coaster device involved in the case at bar are not of a character calculated to injure passengers and that the particular jerk which plaintiff received when she was injured was out of the ordinary. Therefore, we do not consider the freight train cases in point.

We have examined the case of Pointer v. Mt. Ry. Constr. Co., 269 Mo. 104, cited by defendants. That case was decided by a divided court. Nothing is established therein except that (1) in that case specific acts of negligence were pleaded, therefore, the rule of res ipsa loquitur was held not to be applicable and (2) the proof in that case failed to show any unusual occurrence. In the cases of Lumsden v. Thompson Scenic Ry. Co., 114 N. Y. S. 421 and Benedict v. Potts, 88 Md. 52, cited by defendants there was no showing that anything unusual occurred. In the case of Adriance v. Schenck Bros., 95 N. J. L. 185, cited by defendants there was nothing to show how the accident happened. In the case of Murphy v. Steeplechase Amusement Co., 166 N. E. 173, cited by defendants the device involved was called a "flopper" and was calculated to cause people to fall. While plaintiff in the Murphy case testified that he fell as the result of a jerk the device was intended to make one fall. We have examined the other cases cited by defendants and find them not in point.

Defendants insist that there is a certain amount of jerking and jolting necessarily incident to the operation of the roller coaster in question, which fact was fully known to plaintiff when she boarded it; that "there is no evidence in the record anywhere that the movements of the car upon the ride were unusual or extraordi-

nary movements for roller coaster cars." From defendants' contention it would seem that plaintiff received the jar or jerk that she contracted for when she undertook the ride. Defendants point to plaintiff's testimony that she expected to be jarred a "certain amount." However, her evidence shows that she did not expect to receive the excessive jar that she got in this instance, which she described as a "terrible jar," a "quick, sudden and unexpected jar." The words "jar" and "jerk" are relative terms and what would be a jar or jerk to one person would not be to another in this connection there is evidence tending to show that the ordinary jerks and jars received were not severe. In fact the testimony of the witness, Duncan, would tend to show there isn't any jerk in connection with it. It appears that the jerks and jars, so called, that naturally came with riding the device were in going around a turn and the evidence shows that this was caused by the tendency to throw one in the direction of the curve, whereas, in this instance plaintiff was thrown in a different direction, that is, violently upward and over against her side. Defendants' witness, Duncan, testified that this could not have happened under the circumstances unless the ride was "broken," which we assume to mean something untoward an unusual happening to interfere with the ride.

We think there is no question but that plaintiff made out a case under the *res ipsa loquitur* doctrine although no one else was seriously injured. [See cases last cited.]

In connection with their contention that their demurrer to the evidence should have been sustained defendants point out that plaintiff changed her testimony in some respects from that given in her deposition. However, the statements made in the deposition were not conclusively binding upon her. [Davidson v. Frisco Ry. Co., 301 Mo. 79, 86.]

We do not think that plaintiff's testimony as to the matter of the character of the sound that she heard at the time the car gave the jerk in question is not to be considered by us in any respect, because she stated on cross-examination that when she had theretofore testified that it sounded like "locked wheels" her statement was merely a figment of her imagination. As we view her testimony she had never heard the sound of locked wheels and she merely imagined that such a sound would be the same as the one she heard in this instance. She did say that there was a grinding, dragging sound and we may, at least, consider that much of her testimony. Taking all of her testimony, to say nothing of that of witness Burnett's, it tends to show that something unusual and out of the ordinary occurred at the time she was injured. It is suggested by defendants that the sound she heard was perhaps the operation of the brakes. There was testimony from which the jury could find

either way on this subject and, therefore, they could have found that there was no brakes in operation at the time.

Defendants' witness, Osborn, testified that it was fifty or sixty feet from the last curve "before the track straightens out before you get to the first set of drag tracks." Of course, this testimony is inconsistent with that of plaintiff's statement that the curve was about thirty feet from the end of the ride. However, the testimony of defendants' witness, Osborn, establishes that it was quite a distance from the curve to the first brake and, as plaintiff testified that she was injured on the curve, the jury were justified in arriving at the conclusion that the brake had nothing to do with it. She did not hear the car going over the safety device provided for preventing cars from running backward down the incline because these were stationed only on the upward side of the incline and not on the declining side and, of course, were not situated at the curve where she was injured.

While it is true that defendants showed that there was nothing wrong with the device, the weight of this testimony was for the consideration of the jury although plaintiff offered no evidence on this point save of the unusual occurrence. [Bond v. Frisco Ry. Co., 315 Mo. 987; Scheipers v. Mo. Pac. R. R. Co., 298 S. W. 51.]

Defendants contend that the court erred in permitting plaintiff to testify that the car gave a "quick, sudden, unexpected jerk and threw me against the car, and it raised me in almost a standing position, then threw me against the rod," and similar testimony in reference to the character of the jerk and that the sound made was a "dragging" one and it sounded like "locked wheels." Objection to the testimony in reference to the sound being like that made by locked wheels was not made until after the question was answered and it was therefore, too late. No motion was made to strike out her testimony relative to the sound being like that made by locked wheels when it was developed that she was not familiar with such a sound but was merely using her imagination in so describing the sound. It may be conceded for the purpose of the case that the objection to the other testimony of plaintiff, to which exception is now taken, was made as soon as possible under the circumstances. The objection was placed on the ground that the witness was stating a conclusion. It is quite evident that she was not. While such statements are in the nature of conclusions they are permitted in describing facts that cannot be more fully described. [Musick v. United Rys. Co., 155 Mo. App. 64; Laycock v. United Rys. Co., 235 S. W. 91; Beckner v. K. C. Rys. Co., 232 S. W. 745; Rearden v. Railroad, 215 Mo. 105, 135.]

However, it is claimed that plaintiff was not qualified "from her previous rides and her experience thereby gained, to testify to the usual or unusual jerks and jars of the coaster." We find no merit in

this contention. Plaintiff had ridden upon the coaster before and had almost completed her second journey at the time she was injured. We have examined the cases cited by the defendants and find that in none of them was it held that such testimony was incompetent. Some of them involve passengers on freight trains and hold that such evidence is not sufficient to establish negligence on the part of the carrier. We have already differentiated between this case and freight train cases. The case of Elliott v. Railway, 236 S. W. 17, cited by defendants holds .that something more must be shown than the use of mere descriptive words by a witness, who had failed to establish sufficient qualification to judge the matter, in order for such testimony to take the case to the jury. In the case at bar there was other evidence, aside from the statements characterizing the quality of the jerk, tending to show the result of the jerk or what happened at the time, that is, plaintiff was thrown in an unusual manner violently against the rod in front of her and the car made a scraping or dragging noise which was unusual. However, in the Elliott case, as in this case, the evidence of the defendant helped out plaintiff, for defendant's evidence in that case, as in this, showed that something unusual must have occurred in order for plaintiff to have been thrown in the way she was. In this case the evidence of the witness, Duncan, tends to show that plaintiff would not have been jerked and thrown the way she was unless the ride was "broken," which we take to mean that something extraordinary must have happened at the time.

This testimony of defendants' witness, Duncan, was brought out on cross-examination and plaintiff's attorney moved to strike out the testimony as not being responsive. Defendants claim that plaintiff, having objected to the testimony, is not entitled to the benefit of it, although the motion to strike out was overruled and the testimony admitted. No authority is cited in support of such a contention and we think there is no merit in it. The court admitted the testimony and it is in the case for what it is worth.

Complaint is made of the following testimony of plaintiff's witness, Burnett:

"Q. Just describe this jerk. A. It was more unusual than any of the others, and more violent.

MR. ENGGAS: I ask that that be stricken out as a conclusion on the part of the witness."

The motion to strike out was overruled. It is now claimed that Burnett had ridden upon the device but the one time and was not qualified on the subject of unusual jerks. The question was not objected to and, as the answer is responsive to the question, the motion was properly overruled.

Complaint is made of the giving of plaintiff's instruction No. 1 but in this connection defendants advance no other reasons than

to the effect that the demurrer to the evidence should have been sustained and, from, what we have said, defendants' complaint regarding the instruction is without merit.

The judgment is affirmed. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.