[Civ. No. 32467.   Second Dist., Div. One.   Dec. 23, 1968.]

MARY M. POWELL, Plaintiff and Appellant, v. DELL-AIR AVIATION, INC., et al., Defendants and Respondents.

Rosenfeld, Meyer & Susman, Sidney M. Wolinsky and Peter R. Cohen for Plaintiff and Appellant.

Chase, Rotchford, Drukker & Bogust, Lawrence O. de Coster and James J. McCarthy for Defendants and Respondents.

FOURT, J.—This is an appeal from a judgment for defendants in a personal injury action.

A résumé of some of the facts is as follows: on January 17, 1964, plaintiff was a passenger in a DC 3 certified aircraft owned by Las Vegas Hacienda, operated by Dell-Air Aviation and piloted by Robert Knapton on a trip from Burbank, California to Las Vegas, Nevada. Before taking off at Burbank the aircraft was given a routine pre-flight inspection by the maintenance department personnel of Dell-Air. The pre-flight check list was completed and this document was introduced into evidence. The document disclosed that Peter Rayman, the director of maintenance for Dell-Air, had himself conducted that part of the pre-flight check which had to do with the inspection of the seat belts in the aircraft. Rayman stated that he had no specific recollection of the particular procedure carried out on the particular inspection before the flight in question, that he usually conducted a test of the seat belts by a visual inspection and by pulling on both ends of the belt to satisfy himself that the belt was anchored properly and not worn or frayed. This was the general custom and usage in the aviation industry. The pre-flight check list as introduced into evidence disclosed that all seat belts were in a functional and airworthy condition.

The aircraft left Burbank to go to Las Vegas and travelled to within a few miles thereof without any unusual incident. When the aircraft arrived at a point some 10 to 20 minutes out of Las Vegas the pilot, preparatory to making a routine landing, caused the "fasten seatbelts" sign to be lit. About 10 minutes after the seatbelt sign was turned on and while the aircraft was over Lake Mesquite (a dry lake) the aircraft took a sudden, unexpected and violent drop. There are apparently two main types of turbulence, namely, clear air turbulence and weather turbulence. The former is encountered in clear skies and without warning and according to the pilot (who had 25 years' experience as a pilot. had about 18,000 hours in the air and was certified by the F.A.A. as an air transport pilot) the particular turbulence in this instance "was more violent than any he had ever experienced in the past." After righting the aircraft within moments, he proceeded to make

an uneventful landing in Las Vegas within 10 minutes of the encounter with the turbulence. Mrs. Powell was thrown to the ceiling of the aircraft where she "floated like a rag doll" and then was thrown back down partially across the back of the seat she had occupied. The force of the fall was such that the seat she had occupied was damaged. She had bruise marks across her hips and lower abdomen and her physician stated that such marks were characteristic of injuries generally caused by seatbelts fastened across the hips and abdomen. She suffered injuries. The man and woman who apparently were travelling with Mrs. Powell stated that it appeared to them that Mrs. Powell had fastened her seat belt and Mrs. Powell stated that she fastened the belt at Burbank and had never unfastened it during the trip.

After landing the aircraft the pilot made an entry in the logbook indicating that there had been "severe" turbulence and such an entry requires that the aircraft be inspected to ascertain whether any structural damage has been done before the aircraft can be flown again. The pilot called Rayman in Los Angeles and advised him of the incident and of the entry in the logbook. On the morning of January 17, 1964, the pilot, Rayman and an F.A.A. inspector from Los Angeles inspected the aircraft. The inspection of all of the seatbelts in the aircraft revealed that no seat belt had been broken or detached from the floor mounting. A report of the inspection was completed by an F.A.A. inspector and it was stated among other things that "none of the seat-to-floor attachments or seat belts had failed . . . ." The report was received into evidence by stipulation.

An aviation expert testified for each side. Plaintiff's expert, Robert Adickes was retained a week before the date of the trial, had no previous knowledge of the incident in question, had never seen the aircraft involved, had never talked to any crew member of the aircraft and had never checked with the F.A.A. or C.A.B. to ascertain whether either agency had investigated the incident. Nor was he aware of the fact that an inspection of the interior of the aircraft, including the seats and the seatbelts had been made the day following the incident by a qualified F.A.A. aircraft accident investigator.

According to the settled statement, Adickes stated that "if a properly installed seatbelt in good condition was fastened it would, in almost all instances, perform its function of keeping a passenger in her seat." He further stated "that given the bad turbulence which this aircraft encountered, if the belt

was in good condition and had been fastened in a proper manner, it would hold plaintiff in her seat since other passengers were held in their seats." He testified further "that in order to break the seat back of the seat in which the plaintiff was sitting, it would take a force of 10 G's or 1500 pounds assuming a passenger weight of 150 pounds." He further stated "that such a force could have been placed on the seat back of plaintiff's seat when she was propelled back against it after going up in the air out of her seat when the turbulence was encountered." Further he testified "that while a metal-to-metal buckle on a seatbelt was, in his opinion, a safer type of seatbelt fastening, the metal-to-cloth type of buckle fastening was approved by the F.A.A. and used by many airlines." The record also recites: "When it was pointed out to Captain Adickes that the investigator's report stated 'according to crew statements, all passengers had fastened their seatbelts prior to encountering turbulence; however, one female passenger was thrown into the aisle. The cabin attendant stated that she had assured that all seats were fastened.' he stated that it was the custom and usage for stewardesses to merely visually check the lap of passengers in order to determine whether their seatbelts were fastened or not. He further stated it was not the custom of such stewardesses to 'yank' on the belt in the passengers' lap in order to determine whether it was appropriately fastened together." Adickes further testified: "that one way, though a remote and unlikely explanation, in which this incident could be explained was if plaintiff had her seatbelt fastened only loosely it would have been possible for her to have been thrown up out of her seat to the outer most limit of the seatbelt then propelled out of the belt restraint and then thrown downward against the back of her seat with great velocity when the aircraft hit the 'bottom' of its drop. He stated that this possible explanation would be consistent with the evidence of the broken seat back, the intact seatbelt and the marks as shown on the photograph of the plaintiff."

Statement of Vance Breese:

"Mr. Vance Breese, an aviation expert and consultant of many years experience, was called to testify on behalf of defendants. He stated he had reviewed all of the facts contained in the F.A.A. investigator's report and, based on those facts and on other facts in evidence which he was asked to assume as true, it was his opinion that an explanation of the incident was that plaintiff had her seatbelt very loosely

fastened and thus when the turbulence was encountered she went out of her seat and up in the air to the limit of the belt, was then catapulted backwards against the back of the seat, breaking the seat and landing in or across the aisle. This explanation, Mr. Breese testified, was the only explanation of the incident consistent with the facts available to him.

''He further stated, with respect to the metal-to-cloth type of seatbelt, that this type of seatbelt was used at the time of this accident and currently by practically all airlines. He testified that it met all applicable standards of the F.A.A. and, in his opinion, was as safe if not a safer type seatbelt than any other. He had no knowledge as to whether the particular belts on the aircraft involved in the accident had been replaced or what their actual condition was at the time of the accident. He stated that the belt worn by the plaintiff was probably a 1500-pound test belt and met F.A.A. requirements but that the F.A.A. requirement for replacement belts as of the time of the accident was a 3,000 pound test.''

Under the circumstances no useful purpose would be served by setting forth the injuries sustained by plaintiff.

A jury returned a general verdict in favor of the defendants and against the plaintiff. A timely notice of appeal was filed by plaintiff.

Appellant now asserts in effect that the evidence does not support the verdict and that the jury was erroneously instructed.

It is true that no witness testified that plaintiff did not have her seatbelt on when the aircraft dropped suddenly, no witness testified that plaintiff had left her seat prior to the accident, no witness testified as an eyewitness that plaintiff had failed to have her seat belt fastened at any time during the flight or that the seat belt was fastened loosely. The evidence is for all intents and purposes however to the effect that the seat belt was not broken and the seat-to-floor attachments were not broken. The evidence also is to the effect that appellant fastened her seat belt loosely or in such a manner that she was thrown out of her seat to the limit of the belt and then catapulted up and then dropped to the back of her seat thereby being injured.

We view the evidence as an appellate court is required to do. We only determine whether there is any substantial evidence which will support the verdict. (See *Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427 [45 P.2d 183]; *Yakov* v. *Board of Medical Examiners*, 68 Cal.2d 67, 72 [64 Cal.Rptr. 785, 435 P.2d 553].)

This court stated in *Simon* v. *Simon*, 260 Cal.App.2d 626, 631 [67 Cal.Rptr. 317]: " 'With rhythmic regularity it is necessary for us to say that where the findings are attacked for insufficiency of the evidence, our power begins and ends with a determination as to whether there is *any* substantial evidence to support them; . . .' [Citations.] Moreover, it is incumbent upon the appellant who contends that the evidence is insufficient to set forth the evidence in support of the judgment and indicate wherein it is insufficient. 'It is well established that a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact. It is not the province of the reviewing court to search the record in order to ascertain whether it contains evidence that will sustain a contention made by either party to the appeal. Where an appellant claims that some particular issue of fact is not sustained by the evidence, he is required to set forth in his brief all of the material evidence on the point and not merely his own evidence. If this is not done the error assigned is deemed waived. [Citation.]' [Citation.] Although appellant's brief is deficient with reference to the matters just mentioned, we have reviewed the record and find therein substantial evidence to support the judgment . . . .'' The appellant in this case has failed to follow the rule as enunciated. We have read the Settled Statement and we are persuaded that there is ample and sufficient evidence to sustain the judgment.

■ Appellant contends that certain offered instructions should have been given, one of which contains a verbatim copy of the provisions of section 2101, Civil Code.[1] The court gave, among others, BAJI Instructions numbered 204-B and 204-D.[2] In *Pontecorvo* v. *Clark*, 95 Cal.App. 162 [272 P. 591] the

---

[1] "A carrier of persons for reward is bound to provide vehicles safe and fit for the purposes to which they are put, and is not excused for default in this respect by any degree of care." [Enacted 1872.]

[2] BAJI Instruction 204-B: "As a common carrier the defendant Dell Air Aviation, Inc. was required by law to use the utmost care and diligence for the safe carriage of plaintiff, to provide everything necessary for that purpose and to exercise a reasonable degree of skill."

BAJI Instruction 204-D: "The defendant, however, was not a guarantor of the safety of the plaintiff or of her transportation free from injury.

"Its responsibility was not to use the most effective methods for safety that the human mind can imagine, nor that the best scientific skill might suggest. The care required of it, however, was the *highest* that *reasonably* could have been exercised *consistently* with the *mode of* transportation used, and the *practical* operation of its business as a carrier. This requirement must be measured in the light of the best precautions which, at the time of the accident in question, were in common, practical use in the same business and had been proved to be efficacious."

court had under consideration a case involving many considerations similar to the case at bench. Pontecorvo brought an action to recover damages for the death of his 13-year-old daughter who was at the time of the accident riding in a roller coaster. It was in effect agreed that the scenic roller coaster was a common carrier and that the provisions of sections 2100 and 2101 of the Civil Code were applicable to Clark, the defendant. The complaint alleged that the roller coaster was negligently constructed, defective and unsafe. The answer set up that deceased was guilty of contributory negligence. There was a sudden jerk when the coaster was in operation and decedent was thrown from her seat or car. All of the other passengers at the time of the accident remained in their seats and safely completed the ride. An investigator found nothing to have been broken, and no defects were located in the coaster. A verdict was in favor of defendant. On appeal the judgment was affirmed. Plaintiff on appeal contended that under section 2101 of the Civil Code defendant was as a matter of law guilty of negligence. Numerous proposed instructions to the jury were submitted by each side. The judge rejected all of the proposed instructions and gave instructions apparently prepared by himself, two of which were based on sections 2100 and 2101 of the Civil Code. The instructions given are very similar to BAJI Instructions 204-B and 204-D. It is noted that in 204-B the carrier must use ''the utmost care.'' In *Pontecorvo* the court states at 180-181: ''And our dictionaries say that the adjective 'utmost' means 'the greatest or highest degree, quantity or number.' The noun is defined: 'The most that can be; the greatest power, degree or effort.' It is well said in the cases that 'the expression, ''highest degree of care,'' is no stronger than the statutory requirement, ''utmost care.'' The instruction in this regard was not error.' [Citations.] The converse of the proposition stated in the instruction (and the instruction so implies) is, necessarily, that for the slightest neglect against which 'human care and foresight might have guarded,' if such neglect was the proximate cause of the death of the deceased, the defendant would be in law responsible. [Citation.] '' The second instruction in *Pontecorvo* set forth that defendant was not an insurer of the safety of deceased. The court held that the instructions, ''. . . fairly and intelligently state the true rule as to the degree of responsibility which common carriers must assume in safeguarding their passengers against accident or injury, then, of course, there is no real ground for

complaint. Reading the two instructions in this case together, they fairly and with sufficient clarity state the principles of law to which they are addressed . . . ."

We are persuaded that in the case at bench the instructions, read together, with sufficient clearness explain the duty common carriers owe to their passengers in the matter of safeguarding them against accident or injury.

■ Finally, appellant asserts that the court erred in failing to instruct upon the doctrine of res ipsa loquitur. The court gave BAJI Instructions numbered 206-A and 206. In her brief appellant seemingly complains about the court's giving the 206-A instruction, the conditional res ipsa instruction. We will spend no time with this complaint for appellant, according to the Settled Statement, requested the instruction and it was given apparently pursuant to such request.

The jury was properly instructed, there is substantial evidence to support the verdict and the judgment.

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied January 20, 1969.